**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

FILED

FEB 2 1 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| **COURTHOUSE NEWS SERVICE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 2:18-cv-391** |
| ) | |
| **GEORGE E. SCHAEFER, in his Official** ) | |
| **Capacity as the Clerk of the Circuit Court** ) | |
| **for the City of Norfolk; and** ) | |
| ) | |
| **JACQUELINE C. SMITH, in her Official** ) | |
| **Capacity as the Clerk of the Circuit Court** ) | |
| **for Prince William County,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>OPINION & ORDER</u>**

This case is brought under 42 U.S.C. § 1983, filed by Courthouse News Service ("Plaintiff"), and asks this Court whether George E. Schaefer ("the Norfolk Clerk") and Jacqueline C. Smith ("the Prince William Clerk") (collectively, "Defendants" or "the Clerks") deprived Plaintiff of its qualified First Amendment right to access newly-filed civil complaints. The Court held a bench trial, commencing on January 31, 2020, and **FOUND** that (1) the First Amendment guarantees a qualified right to access newly-filed civil complaints contemporaneously with their filing, and (2) that during the months of January of 2018 through June of 2018 and for a period of time thereafter, Defendants deprived Plaintiff of that right. The Court hereby **ISSUES** this Opinion and Order pursuant to Federal Rule of Civil Procedure 52(a) to further explain its findings of fact and conclusions of law. Any item marked herein as a finding of fact which may also be construed as a conclusion of law is hereby adopted as such. Any item marked herein as a conclusion of law which may also be construed as a finding of fact is hereby adopted as such.

1

# I. FINDINGS OF FACT

## A. THE PLAINTIFF

1. Plaintiff is a nationwide news service that reports on civil litigation in state and federal courts throughout the United States. See Trial Tr. 33:14-20 (Girdner). Plaintiff was founded in 1990. Trial Tr. 35:11-12 (Girdner). It competes with several other nationwide news services in providing similar data.

2. Plaintiff has more than 2,200 subscribers nationwide for its subscription-based publications. In addition to law firms, Plaintiff subscribers include news and entertainment media outlets, academic institutions, publicly traded companies, government entities, and non-profit organizations.

3. Plaintiff's publications include its New Litigation Reports, which contain staff-written summaries of newsworthy new civil complaints. Doc. 77 ("FPTO") at 1-2. The New Litigation Reports is a daily publication that focusses on complaints against businesses and government entities, and any other civil lawsuits that may be of interest to Plaintiff's subscribers. FPTO at 1-2, Trial Tr. at 41:6-22 (Girdner). Legal news, like all other news, has a short shelf-life. Accordingly, it is important for news providers to have contemporaneous access to public documents. Trial Tr. 56:12-19 (Girdner).

4. Plaintiff publishes two daily New Litigation Reports for courts in Virginia. The Virginia Report includes coverage of the Circuit Court for Prince William County, Virginia, among other state and federal courts. FPTO at 2. The Southern Virginia State Report includes coverage of the Circuit Court for Norfolk, Virginia, among other state and federal courts. FPTO at 2; see generally P45; P46.

5. Among Plaintiff's other publications is the Daily Brief, which covers published, nationwide appellate rulings, including all U.S. Supreme Court and federal circuit decisions, as well as significant rulings from the federal courts, including the two Districts in Virginia.

6. Plaintiff also publishes a publicly available website, www.courthousenews.com, which features original news reports and commentary written by Plaintiff's staff and which is read by hundreds of thousands of people each month. Trial Tr. 44:19-46:7 (Girdner); see generally P27.[1]

7. Plaintiff's employs reporters across the country who are assigned to cover particular federal and state courthouses. Among their duties is reviewing and summarizing new civil complaints for the New Litigation Reports and writing stories for the website. The CNS reporter covering the Prince William Circuit Court, Joan Hennessey, generally visits the court at the end of the day, usually arriving at approximately 4:30 p.m. FPTO at 4. The CNS reporter covering the Norfolk Circuit Court, Jocelyn Rardin, generally visits the court at the end of the day, usually arriving after 4:00 p.m. FPTO at 4.

8. Traditionally, members of the press covered new litigation in major metropolitan areas around the country by sending reporters to the courthouse towards the end of each day to review civil complaints that had been filed that day. Trial Tr. at 35:2-10, 36:13-22 (Girdner).

9. From Plaintiff's founding in 1990, its reporters worked alongside reporters from newspapers and other media, reviewing each day's complaints across the country, which court staff provided to the press as a matter of course. See Trial Tr. 34:25-36:12; 37:6-38:2; 38:16-39:22 (Girdner).

10. Plaintiff competes with companies such as Thompson Reuters, LexisNexis, and Bloomberg. Trial Tr. 46:21-25 (Girdner).

---

[1] Plaintiff's Exhibits are marked as P{X}, Defendants' exhibits are marked as D{X}, and the Joint Exhibits are marked as Joint Exhibit {X}.

11. Other media outlets and academic institutions rely on Plaintiff to learn about newly-filed litigation. P4, P3. Plaintiff has been credited as the original source of reporting by newspapers, legal publications, magazines, television, radio, and online media. Trial Tr. 49:616 (Girdner); P5.

12. Plaintiff, and other members of the press and public, have historically enjoyed a tradition of court clerks making most newly-filed civil complaints publicly available on the day that they are filed. Trial Tr. at 35:2-10, 36:13-22 (Girdner).

## B. THE DEFENDANTS

13. In Virginia, Circuit Court Clerks derive their authority from the Virginia Constitution and operate independently. FPTO at 3. Clerks of Court are elected officials. See id.

14. The elected Clerk of the Circuit Court for the City of Norfolk is George E. Schaefer. FPTO at 3. Mr. Schaefer was elected in 2003 and re-elected in 2011 and in 2019. FPTO at 3.

15. The elected Clerk of the Circuit Court for the County of Prince William is Jacqueline C. Smith. Ms. Smith was elected in April of 2017. FPTO at 3. As the Clerk of the Circuit Court for the County of Prince William, Ms. Smith's office also serves the City of Manassas, Virginia and the City of Manassas Park, Virginia. Trial Tr. 374:20-25 (Smith).

16. Under Virginia law, Defendants are the custodians of their courts' records, including civil complaints. Trial Tr. 330:5-17; 332:1-3 (Schaefer); 376:12-25; 395:9-11 (Smith).

17. As circuit court clerks, Defendants are responsible for developing and implementing the policies and procedures for operating the Prince William Circuit Court Clerk's Office and the Norfolk Circuit Court Clerk's Office, respectively, including the receipt and maintenance of civil court records. FPTO at 3; e.g., Trial Tr. 404:12-17 (Smith).

18. Defendants are responsible for the administration of civil court records, and for ensuring that those records are maintained and available to the public for inspection and examination. Trial Tr. 330:5-17 (Schaefer); 376:12-25; 395:9-11 (Smith).

19. Defendants act through their employees, and delegate to their employees the responsibility of responding to requests for court records, including new civil complaints, and the responsibility of ensuring that those records are maintained and available in a timely manner to the public for inspection and examination at their respective courts. E.g., Trial Tr. 361:23-362:21 (Schaefer).

## C.     FILING PROCEDURES AT DEFENDANTS' OFFICES

20.  In either Clerk's Office, a person seeking to file a civil complaint may do so by delivering a hard-copy, paper document to the Clerk's Office by hand delivery or mail delivery, or by electronically filing the document. FPTO at 4-5. A pleading is considered filed when it is physically delivered to the clerk and the fee is paid.  See Alexandria Redevelopment & Hous. Auth. v. Walker, 772 S.E.2d 297, 300 (Va. 2015).[2]

21. The Clerks utilize several technology platforms when docketing a complaint received in paper or electronic form, including the Circuit Case Management System ("CCMS"), Case Imaging System ("CIS"), Officer of the Court Remote Access ("OCRA") system, the Financial Accounting System ("FAS"), and the Virginia Judiciary E-Filing System ("VJEFS"). FPTO at 3-4.  Additionally, each Clerk offers public access terminals at which any member of the press or

---

[2] The Supreme Court of Virginia has made clear, "[w]hen not filed electronically, a pleading is filed when it is physically delivered to the clerk of court" and "a circuit court clerk's 'filed' stamp is usually conclusive evidence of the filing date." Alexandria Redevelopment & Hous. Auth. v. Walker, 772 S.E.2d 297, 300 (Va. 2015). However, the Alexandria Redevelopment court did not have an occasion to determine whether failure to tender fees renders a paper unfiled. Id. at n.8. However, in an unpublished opinion, the Supreme Court of Virginia affirmed the dismissal with prejudice of a complaint, because, although the filer physically delivered a complaint and paid what he thought was the appropriate fee, the filer's tendered fee was $2.00 short of the appropriate fee. Landini v. Bil-Jax Inc., No. 140591 (Va. Jan. 30, 2015) (unpublished), available at http://courts.state.va.us/courts/scv/orders_unpublished/140591.pdf (last visited on February 11, 2020). The Landini holding is consistent with the evidence presented at trial.

public may review filings scanned into CIS. FPTO at 4. Both Clerks maintain a "paper on demand" policy, meaning that, with limited exception, all files are maintained in electronic format. See, e.g., Trial Tr. 383:9-14; 387:9-22 (Smith).

22. VJEFS is the system used by attorneys to electronically file ("e-file") civil cases in certain Virginia circuit courts. VJEFS records are maintained by the Office of the Executive Secretary of the Supreme Court of Appeals of Virginia ("OES"). FPTO at 4. It is not administered or maintained by the Norfolk Clerk's Office or the Prince William Clerk's Office. FPTO at 4.

23. OES, in its capacity as the administrator of the Virginia circuit courts, maintains filing data for cases filed in the circuit courts using the OES technology applications. This filing data (the "OES Filing Data") comes from data logs from: CCMS, CIS, VJEFS, FMS, and the credit card processor for e-filed cases. FPTO at 4.

*i. Prince William Procedure*

24. A new civil complaint filed in paper at the Prince William Circuit Court goes through several stages before it can be viewed on the public access terminals: (1) initial intake; (2) Circuit Court Case Management System ("CCMS") data entry; and (3) scanning. Trial Tr. 381:11-12 (Smith) These steps, which occur after the court's receipt of a new complaint, are often collectively referred to as "processing." The Civil Division of the Prince William Clerk's Office is open to the public Monday through Wednesday, 9:30 a.m. to 5:00 p.m., and Thursday through Friday, 8:30 a.m. to 5:00 p.m. FPTO at 4.

25. ***Stage One: Initial Intake***. A deputy clerk at the intake counter receives a new complaint and immediately stamps "filed" and the date on the face of the complaint. The clerk skims the document to identify the type of document being filed and, when a civil complaint, the cause of action and amount at issue. See, e.g., Trial Tr. 398:7-17 (Smith). The clerk enters initial

6

data about the complaint, e.g., the name of the plaintiff and at least one defendant, the type of document being received, the amount of damages sought, etc., into the court's FAS, which calculates the filing fee. E.g., Trial Tr. 398:18-24 (Smith); D26. The clerk then receives the payment and a case number is generated. A receipt identifying the payment amount and case number (among other things) is printed at the counter and handed to the filer. Trial Tr. 386:5-18; 386:24-387:5 (Smith).

26. While the partial docket information entered into FAS can be viewed on the public access terminals after initial intake, the complaint itself is not available on the public access terminals until after CCMS data entry and scanning. Trial Tr. 387:23-25 (Smith).

27. ***Stage Two: CCMS Data Entry***. A deputy clerk opens the court's case management system – CCMS – on his/her computer terminal. Information about the complaint previously entered into FAS during intake is automatically populated in CCMS. Trial Tr. 386:19-387:3 (Smith). When the clerks' staff set aside a newly-filed complaint and take the first processing steps after the day the complaint is filed, the system will auto-populate the "filing date" to reflect the date of processing rather than the actual date of filing. In those instances, clerks are expected to manually correct the "filing date" in the system, but do not always do so. When they do not manually update the "filing date," the CCMS "filing date" field will reflect a date later than when the complaint was actually filed.

28. The deputy clerk enters additional case information into CCMS, including the names of additional parties, the attorneys' names, if the document is a complaint, the type of complaint (e.g., motor vehicle tort), and, if service is requested, that information is also entered. E.g., D27; D28; D29; D30; D31; D32.

29. ***Stage Three: Scanning***. At some point after CCMS data entry, the deputy clerk scans the complaint into digital form using a scanner that is located at each deputy clerk's desk. The deputy clerk is able to view the scanned pages on the screen on the desk as scanning proceeds. The scanned complaint is then linked to the CCMS docket and can be viewed on the public access terminals almost immediately. See Trial Tr. 387:23-25; 395:20-396:5; 397:6-11; 400:4-14 (Smith).

30. Fewer steps are required for new e-filed complaints to be processed and made available on the public access terminals, because the filers submit the documents in digital form on the VJEFS (i.e., they do not need to be scanned by clerks) and enter the case data that a deputy clerk would otherwise enter into FAS and CCMS. Thus, VJEFS handles the initial intake, CCMS data entry, and scanning work that a clerk would perform for a paper filing. A deputy clerk then accesses VJEFS, cursorily reviews and performs post-filing formal "acceptance" of the filing, at which point it is made available to the public on the public access terminals. Trial Tr. 389:8-390:6 (Smith).

*ii. Norfolk Procedure*

31. The Norfolk Clerk's Office is open to the public Monday through Friday, 8:45 a.m. to 4:45 p.m. FPTO at 4. A new civil complaint filed in paper at the Norfolk Circuit Court goes through several stages before it can be viewed on the public access terminals: (1) initial intake; (2) CCMS data entry; and (3) scanning. These steps, which occur after initial intake, are often collectively referred to as "processing."

32. ***Stage One: Initial Intake***. Court staff at the intake counter receive a new complaint across the counter and "receipt" the complaint by reviewing the case type, stamping the face page "filed" with a date stamp, entering the initial case data into FAS, calculating the filing fee,

receiving the filing fee, generating a case number and writing it on the face page of the complaint, and then printing a receipt. Trial Tr. 106:24-108:16 (Larson). This process takes a matter of minutes. Trial Tr. 108:13-17 (Larson).

33. This initial intake is performed by civil deputy clerks at the intake counter. Trial Tr. 106:24-107:2 (Larson).

34. While the partial docket information entered into FAS can be viewed on the public access terminals after initial intake, the complaint itself is not available on the public access terminals until after CCMS data entry and scanning. Trial Tr. 110:1-10 (Larson).

35. ***Stage Two: CCMS Data Entry***. A deputy clerk opens CCMS on his/her computer terminal. The deputy clerk will enter basic case information, such as attorneys' names, parties' names, and general case information into the CCMS system. Trial Tr. 109:8-110:10 (Larson). Information about the complaint previously entered into FAS during intake is automatically populated in CCMS. Trial Tr. 110:3-10 (Larson). The length of time that this process takes depends on the complexity of the case. Trial Tr. 110:11-17 (Larson). This stage is sometimes referred to as "indexing" or "docketing."

36. When the clerks' staff set aside a newly-filed complaint and take the first processing steps after the day the complaint is filed, the system will automatically populate the "filing date" to reflect the date of processing rather than the actual date of filing. In those instances, clerks are expected to manually correct the "filing date" in the system, but do not always do so. When they do not manually update the "filing date," the CCMS "filing date" field will reflect a date later than when the complaint was actually filed. Trial Tr. 116:7-117:8 (Larson). The deputy clerk will then enter basic case information discussed <u>supra</u> at ¶ 28. E.g., D27; D28; D29; D30; D31; D32.

37. ***Stage Three: Scanning***. The clerk scans the complaint into digital form using a scanner located at the clerk's workstation. The clerk is able to view the scanned pages on the screen at his/her workstation as scanning proceeds. The scanned complaint is then linked to CCMS and can be viewed on the public access terminals located in the Norfolk Clerk's Office. Trial Tr. 111: 4-8 (Larson). A paper is publicly available immediately, or with de minimis delay, after scanning. Trial Tr. 111:9-13 (Larson).

38. Fewer steps are required for new e-filed complaints to be processed and made available on the public access terminals, because the filers submit the documents in digital form on VJEFS (i.e., they do not need to be scanned by clerks) and enter the case data that a deputy clerk would otherwise enter into FAS and CCMS. Thus, VJEFS handles the initial intake, CCMS data entry, and scanning work that a clerk would perform for a paper filing. A deputy clerk then accesses VJEFS, cursorily reviews and performs post-filing formal "acceptance" of the filing, at which point it is made available to the public on the public access terminals. Trial Tr. 127:18-128:17;129:13-23 (Larson).

## D.     DEFENDANT'S PROCEDURES, PRACTICES, AND CUSTOMS

### i. Norfolk

39. Plaintiff's Southeast Bureau Chief Ryan Abbott visited the Norfolk Clerk's Office in August 2017 to explore the court's access procedures and to request access to newly-filed complaints that had not yet been posted to the public access terminals.  Trial Tr. 263:14-264:3 (Abbott).

40. Mr. Abbott was referred to Norfolk Circuit Court civil deputy clerk Sonya Turner. After introducing himself as a reporter and bureau chief for Plaintiff , Mr. Abbott requested access to civil complaints that had been filed but not yet fully processed and scanned. Ms. Turner informed

Mr. Abbott that Plaintiff had to wait to see new complaints until they were available on the public access terminals – after initial intake, CCMS data entry, and scanning – pointing as she spoke to a sign on the clerks' inner office door which read "Officers of the Court." Trial Tr. 263:21-265:9 (Abbott).

41. In September of 2018, approximately two months after this lawsuit was filed, members of Plaintiff's staff met with the Norfolk Clerk and some of his staff. Trial Tr. 122:17-123:2 (Larson). That meeting was intended to review Plaintiff's complaints of untimely access. Trial Tr. 122:17-123:2 (Larson).

42. Until that meeting, Plaintiff was subject to the policy, custom, and practice of providing access to complaints only after full processing, including scanning and being made available for viewing on the public access terminals. E.g., Trial Tr. 265:10-19 (Abbott).

43. During the time frame relevant to this lawsuit, January, 2018, to June, 2018, and currently, the public and non-public (i.e., behind the-counter) spaces in the Norfolk Clerk's Office were, and currently are, separated by a door with a sign stating: "Officers of the Court." Trial Tr. 106:12-22 (Larson).

44. The Norfolk Clerk does not have any written policies for providing the public or media with access to new civil complaints. E.g., Trial Tr. 122:13-14 (Larson).

*ii. Prince William*

45. During the relevant timeframe, and currently, the Prince William Clerk's Office's policy, custom, and practice was, and is, to make new complaints available only on the public access terminals – after the completion of initial intake, CCMS data entry, and scanning. E.g., Trial Tr. 404:2-6 (Smith).

46. The Prince William Clerk's Office has, at times, made exceptions to its policy, custom, and practice of providing access to new complaints only on the public access terminals after processing. See Trial Tr. 7-11 (Smith).

47. Prior to 2018, Plaintiff was often able to review new complaints before CCMS data entry and scanning. This enabled Plaintiff to review the vast majority of complaints on the day of filing.

48. On January 25, 2018, in response to a request by Plaintiff for several complaints that had been filed but not yet scanned and made available on the public access terminals, Civil Division Supervisor Brenda Elford informed Plaintiff's Southeast Regional Bureau Chief Ryan Abbott that Plaintiff could not see new complaints until they were available on the public access terminals – after intake, CCMS data entry, and scanning. Trial Tr. 258:6-23 (Abbott).

49. From that time until some point after the filing of this lawsuit, Plaintiff was only permitted to see new civil complaints after they had been fully processed, including having been scanned and made available for viewing on the public access terminals. E.g., Trial Tr. 404:2-6 (Smith).

50. In or about November 2017, a sign was posted in various locations in the Prince William Clerk's Office, including at the public access terminals, which stated: "We are dedicated to scanning all new civil filings into our digital system within ten (10) days of receipt in this office." That sign remains posted. Trial Tr. 401:1-5 (Smith).

51. Other than the sign posted in the Clerk's Office, no written policy of the Prince William Clerk's Office concerning responses to requests for newly-filed civil complaints was introduced into evidence.

52. After Plaintiff filed this lawsuit, the Prince William Clerk denied that the delays in this case ever occurred; has maintained that her office is under no legal obligation to provide the level of access it began to provide only after this lawsuit was filed; and has asserted that her office could not provide same-day access to complaints without disrupting business operations even though it is now, on a post-lawsuit basis, doing just that. Doc. 52 ¶¶ 55-56, 58-59, 61.

## E. DELAYS IN ACCESS

53. Both parties called expert witnesses to explain their opinions on what the OES filing data means for this case. Each party stipulated to the qualifications of the other party's expert witness. Trial Tr. 170:23-171:1 (Plaintiff's Counsel).

*i. Defendant's Expert Testimony*

54. Defendants relied on the testimony of Dr. David Harless.

55. The Court accords the testimony of Dr. Harless little weight.

    a. Dr. Harless relied on an incorrect data set for this case. Dr. Harless considered all initial civil filings accepted by the two (2) Virginia Circuit Court Clerks, despite the fact that this litigation centers around general civil complaints. General civil complaints were the category of newly-filed civil complaints to which Plaintiff sought access. Dr. Harless, on the other hand, relied on a much broader data set encompassing any initial civil filing. Dr. Harless's data set included filings of little, if any, value to Plaintiff, including concealed handgun permits, restoration of gun rights petitions, marriage licenses, pawnbroker license applications, and name change petitions among others. Dr. Harless was advised that Plaintiff's complaint focused on a much smaller set of initial filings. Trial Tr. 455:7-12 (Harless).

b. Dr. Harless presented his conclusions as number of filings available "within one court day." This metric includes filings that were available on the same day that they were filed and filings that were available on the court day immediately following the day that they were filed. E.g., Trial Tr. 453:16-21 (Harless).

c. Although Dr. Harless presented his opinions in the form of number of filings available "within one court day," he did not break his analysis down to show how many filings were available on the same day that they were filed and how many filings were available on the court day immediately following the day that they were filed. E.g., Trial Tr. 453:16-21 (Harless).

d. Dr. Harless used unreliable "start dates" and "end dates" for measuring the length of time that a civil filing was publicly unavailable. Dr. Harless relied on a "start date" that is automatically populated in the electronic system by CCMS. However, testimony at trial indicated that this is not always an accurate date. Ms. Kancherla, Plaintiff's expert witness, independently relied upon the date on which a pleading was filed by checking the date of the "FILED" stamp on the paper copy of the pleading. Trial Tr. 203:3-204:18 (Kancherla); 477:4-6 (Harless).

e. Dr. Harless also used the date on which the CCMS data is publicly available. Trial Tr. 464 17-18; 465:2 (Harless). As explained supra, the CCMS data includes basic information about the case, such as the names of the plaintiff and defendant and the general category of the case. The CCMS data does not include specific information about the allegations and legal theories of the lawsuit that one would find in a complaint. That specific information is publicly

available when the pleading itself is scanned into CIS. This is significant, because time may pass between the date on which the CCMS general information is available and the date one which the actual pleading is scanned and publicly available. Indeed, the data show that on many occasions the date on which the pleading was scanned is later than the date on which the CCMS general information became publicly available. Ms. Kancherla, Plaintiff's expert witness, relied on the date on which an initial filing was manually stamped 'filed' as her end date. Trial Tr. 201:10-20 (Kancherla).

f.  Dr. Harless indicated that he chose to use the date on which CCMS general case information was made publicly available, because of the possibility of re-scanning. Trial Tr. 464 17-18; 465:2; 470:14-471:16 (Harless). Re-scanning is a situation in which a pleading, for a variety of reasons, may have to be "re-scanned" into the system. Thus, the scan date could, theoretically, change. However, evidence at trial showed that re-scanning usually happens immediately after an error is discovered on the filing date. Trial Tr. 118:24-119:1; 120:13-14 (Larson); 316:11-13 (Elford). Also, the scan date reflected in the OES statistics is the re-scan date, not the date of original scanning Trial Tr. 470:14-471:16 (Harless). Furthermore, Dr. Harless could not quantify how often re-scanning occurred and Mr. Larson said an instance had not come to his attention in three (3) to four (4) years. Trial Tr. 475:8-9 (Harless).

g.  Accordingly, Dr. Harless's method had the effect of relying on a data set which caused him to consider data irrelevant to the case; he could not differentiate between pleadings that were available on the same day that they were filed and

pleadings that were publicly available on the court day immediately following the day on which they were filed, and Dr. Harless relied on improper start and end dates. Therefore, the Court **FINDS** that Dr. Harless's opinions are of no value to this case.

h. In summary, Dr. Harless's generalized statistical finding were based upon erroneous assumptions and entirely inconsistent with OES's own data.

*ii. Plaintiff's Expert Testimony*

56. Plaintiff relied on the testimony of Ms. Amita Kancherla.

57. Ms. Kancherla concluded that between January 2018 and June 2018 the Norfolk Circuit Court made 5% of new civil complaints available on the day of filing; 25% available the next court day after filing; 43% available two court days after filing; and 26% available three or more court days after filing. P6; P8.

58. Ms. Kancherla opined that by September 2018, the Norfolk Circuit Court made approximately 40% of new civil complaints available on the day of filing; approximately 70% available on the day of filing in October 2018; and approximately 90% available on the day of filing in November 2018. P8; Trial Tr. 217:6-10 (Kancherla).

59. Ms. Kancherla concluded that between January 2018 and June 2018 the Prince William Circuit Court made 38% of new civil complaints available on the day of filing; 22% available the next court day after filing; 16% available two court days after filing; and 23% available three or more court days after filing. P7; P9.

60. Ms. Kancherla further concluded that by September 2018, the Prince William Clerk's Office was making approximately 78% of new civil complaints available on the day of filing. By

November 2018, access had slid back somewhat, with the court making approximately 65% of new civil complaints available on the day of filing. P9; Trial Tr. 218:4-8 (Kancherla).

61. However, the Court reviewed the data and could not find a basis to support Ms. Kancherla's opinion that 5% of newly filed civil complaints in Norfolk were publicly available on the day that they were filed. See Joint Exhibit 1; P6; P7; P8; P9. This figure markedly differs from the OES data. While some differences are traceable to her reliance on the stamped filing date as her "beginning date" the 5% figure is not supported by a preponderance of the evidence.

62. The Court **FINDS** that Ms. Kancherla's opinions are entitled to significant weight and are reasonably consistent with the OES statistics save for the 5% figure discussed supra ¶ 61. Ms. Kancherla analyzed a relevant set of civil complaints, and Ms. Kancherla verified the filing date of those complaints based upon the physical examination of the paper filings with the date stamped on the initial document filed.

### iii. The Court's Review of the Raw Data

63. The Court conducted its own de novo review of the raw OES data[3] to compare it to the conclusions of the expert witnesses. Based on that review, the Court observes that the number of newly-filed civil complaints that were made publicly available on the same day that they were filed is higher in Norfolk than to what Ms. Kancherla testified. As noted previously, this is due in some degree to her use of the stamped filing date.

64. However, under the Court's own review of the raw OES data, the level of access at both the Norfolk and Prince William Clerks' Offices was deficient during the relevant timeframe.[4]

---

[3] The data discussed herein are drawn from the entirety of Joint Exhibit 1.
[4] By "relevant timeframe" the Court is referring to the six (6) month period in 2018 before this lawsuit was filed: January through June 2018.

65. The following charts show the date on which newly filed, general civil complaints were made publicly available in each Clerk's Office for the year 2018.[5] Each chart is followed by a graphical representation of the data. The Court omitted December 2018, because the parties only produced data through December 4, 2018.

| Figure 1: Availability of Newly Filed General Civil Complaints in Prince William County in 2018 | | | |
|---|---|---|---|
| Month | Available on the same day of filing | Available the court day after filing | Available two or more court days after filing |
| January | 66.9% | 13.5% | 18.6% |
| February | 58.3% | 13.5% | 28.1% |
| March | 64% | 18.4% | 17.6% |
| April | 70.6% | 9.5% | 19.8% |
| May | 67.9% | 13.2% | 18.8% |
| June | 54.2% | 13.5% | 32.2% |
| July | 42.4% | 16% | 41.5% |
| August | 76.7% | 7.7% | 1.5% |
| September | 93.2% | 3.8% | 1.9% |
| October | 90.6% | 5.8% | 3.4% |

---

[5] In reviewing these data, the Court **INCLUDED** the following categories of civil complaints, as are appropriately deemed "general civil complaints:" APPL – Local Government, GAPL – Detinue, GAPL – Zoning, GAPL – Warrant in Debt, GAPL – Unlawful Detainer, Declaratory Judgment, Motor Vehicle, Compromise Injury/Settlement, Contract Action, Specific Performance, Quiet Title, Medical Malpractice, General Tort Liability, Intentional Tort, Complaint Catch All, Condemnation, Delinquent Taxes, Injunction, Landlord Tenant, Crossclaim, Counterclaim, Wirt of Mandamus. This is a complete and exhaustive list of the categories of cases that the Court tracked. The Court **EXCLUDED** initial civil filings that are not "general civil complaints," such as concealed handgun permits, divorce, appointment of guardian, name change petition, restore felony, reinstatement, garnishment, liens, pawnbroker applications, forfeiture of property, change of sex, bond forfeiture, and appointment of church trustee.

| November | 88.1% | 8.3% | 3.5% |
|----------|-------|------|------|



## PRINCE WILLIAM FILING DATA

**——— SAME DAY    — — WITHIN ONE COURT DAY    ⋯⋯⋯ TWO COURT DAYS OR MORE**

*Figure 2: Line Graph Showing the Changes in Access in Prince William County During 2018*[6]

| **Figure 3:** | | | |
|---|---|---|---|
| **Availability of Newly Filed General Civil Complaints in the City of Norfolk in 2018** | | | |
| **Month** | **Available on the same day of filing** | **Available the court day after filing** | **Available two or more court days after filing** |
| January | 31.7% | 38.8% | 29.4% |
| February | 34.2% | 39.7% | 26% |
| March | 37.3% | 46.1% | 16.4% |
| April | 32.8% | 38.1% | 27.6% |
| May | 19% | 59% | 22% |
| June | 39.3% | 43.8% | 16.8% |

---

[6] The vertical arrow marks the month in which this lawsuit was filed.

| | | | |
|---|---|---|---|
| July | 41.5% | 41.5% | 16.9% |
| August | 40% | 54.4% | 5.5% |
| September | 56.7% | 36.4% | 5.4% |
| October | 68.3% | 30.6% | 1% |
| November | 92.3% | 7.6% | 0% |

## NORFOLK FILING DATA



**——SAME DAY — —WITHIN ONE COURT DAY ····· TWO COURT DAYS OR MORE**

*Figure 4: Line Graph Showing the Changes in Access in the City of Norfolk During 2018*[7]

66. According to these data, both Clerks' level access grew at a high rate after July, 2018. By the end of the period for which the Court has data, the Norfolk Clerk achieved over 90% same-day access and the Prince William Clerk more than 88% same-day access. If one were to set aside the instances of less than same-day access for the five (5) days surrounding the Thanksgiving holiday, the Prince William Clerk also achieved 90.24% in November, 2018.

---

[7] The line marked "A" denotes the month in which this lawsuit was filed. The line marked "B" denotes the month in which the Norfolk Clerk met with Plaintiff to discuss access to newly-filed civil complaints.

*iv. Post-Lawsuit Access*

67. After this lawsuit was filed in July of 2018, both Clerks' Offices produced dramatic improvements in access. Access in the Norfolk Clerk's Office showed its most dramatic improvement after the September 2018 meeting between Ms. Schaefer's staff and Plaintiff's staff. There is no explanation or evidence offered to explain the dramatic increase in access in both the Norfolk and Prince William Clerks' Offices shortly after this lawsuit was filed. Neither Clerks had a significant change in its number of civil filings and both offered testimony that no additional staff was added and no policies or procedures were changed.

68. Plaintiff, by its own admission, is not suffering from unacceptable delays at the present time. E.g., Trial Tr. 81:6-9 (Girdner).

69. Although Plaintiff is not suffering from unacceptable delays at the present time, there is no evidence of any assurance that Defendants will not revert back to unconstitutional practices. Deputy clerks from both offices testified that they could not meet the accessibility rates of 80-85% of accessibility of designated new civil filings on the date of filing without draconian actions including denying equal access to the rest of the public, hiring additional staff, and working overtime. However, in spite of their protestation, to the contrary they began achieving the 80-85% level of access and better in late 2018 and Plaintiff's evidence indicates that they have continued to do so up to the present date.

70. The delays in access discussed herein are the result of Defendants' practices and customs, but not due to their formal policies.

71. There is insufficient evidence to show that the practices and customs that resulted in the delays in access were narrowly tailored to serve a substantial or compelling government interest.

## II. CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. § 1983; and the First and Fourteenth Amendments to the United States Constitution.

This Court has personal jurisdiction over Defendants because they are located within this District and have appeared without objecting to personal jurisdiction.

Venue in this District and Division is proper, because a substantial portion of the events and omissions occurred in this District and Division, the Norfolk Clerk's Office is in this District and Division, the Prince William Clerk's Office is located within this Division, and the Prince William Clerk is properly joined in this case. 28 U.S.C. § 1391(b); Loc. R. Civ. P. 3; Doc. 48 at 7-11.

The legal issues presented by this case are: (A) whether this case is moot; (B) whether Plaintiff has satisfied the elements required to impose section 1983 liability on Defendants; (C) whether the First Amendment provides a right of access to a subset of newly-filed civil complaints; (D) if there is a First Amendment right, was it violated by Defendants; and (E) what remedy, if any, should be granted.

### A. MOOTNESS

Defendant argues that whether Plaintiff received contemporaneous access to civil complaints is moot, because Defendants are now providing Plaintiff with the access it seeks. The Court **FINDS** that this matter is not moot.

The United States Constitution limits the federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. Thus, in order for a federal court to have jurisdiction, an actual controversy must exist. "To qualify as a case fit for federal-court adjudication, 'an actual

controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)). When an actual controversy no longer exists (or never existed), the case is said to be "moot" and the Court is without jurisdiction to hear it.

However, the Supreme Court of the United States has recognized, "that a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). Indeed, "[t]he mootness doctrine ordinarily does not extend to situations where a party quits its offending conduct partway through litigation." 6th Cong. Dist. Republican Comm. v. Alcorn, 913 F.3d 393, 407 (4th Cir. 2019). This "voluntary cessation exception" seeks to prevent a situation where a defendant stops potentially unlawful conduct after it is sued, and then resumes that conduct after the lawsuit is declared moot. Already, 568 U.S. at 91. The voluntary cessation doctrine will not save a lawsuit where "there is no reasonable expectation that the wrong will be repeated." Lyons Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 800 (4th Cir. 2001) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)). A defendant has a "heavy burden" to prove that there is no reasonable expectation that the wrongful conduct will be repeated. Id.

While Defendants are now providing Plaintiff the access it seeks, there is ample evidence to show that during the relevant time period, Defendants denied Plaintiff its constitutionally protected right of access. There is no evidence of a formal policy or other means to show that the alleged unlawful delays cannot reasonably be expected to reoccur. Defendants continue to deny that any unconstitutional delays occurred and even represent that they have not changed any policies or practices since this lawsuit was filed. Nevertheless, the evidence shows that the

unconstitutionally deficient access remarkably improved after this lawsuit was filed. Without more, Defendants cannot show that it is "absolutely clear" that the illegal conduct will not be repeated. Deal v. Mercer Cty. Bd. Of Educ., 911 F.3d 183, 191 (4th Cir. 2018) (emphasis in original). Accordingly, this case is not moot.

## B.    SECTION 1983 LIABILITY

In order to prevail in a section 1983 case, such as this one, a plaintiff must prove that (1) he was deprived of a federally protected right (2) by a "person" (3) acting under color of state law. 42 U.S.C. § 1983; Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003); Moody v. City of Newport News, 93 F. Supp. 3d 516, 529 (E.D. Va. 2015); Woodson v. City of Richmond, 2 F. Supp. 3d 804, 809 (E.D. Va. 2014). Section 1983 liability attaches where the deprivation of constitutional rights was caused by an official policy, custom, or practice. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978) (Section 1983 liability must be based on an official policy or custom); see also Los Angeles Cty. v. Humphries, 562 U.S. 29, 36 (2010) ("usage" and "practice" are customs for which Section 1983 liability is appropriate).

### i. Deprivation of a Federally Protected Right

As described in further detail infra at sections II.C and II.D, the Court **FINDS** that there is a federally protected right under the First Amendment to the United States Constitution to access newly-filed civil complaints contemporaneously with filing and that such right was violated by Defendants in this case.

### ii. "Person"

State officials acting in their official capacities are generally not suable "persons" under section 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). However, state officials in their official capacities are section 1983 "persons" when the plaintiff seeks prospective,

equitable relief. Id. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State."); Ex parte Young, 209 U.S. 123, 159-160 (1908).

In order to bring itself within the "Ex parte Young exception," a plaintiff's complaint need only plead that an ongoing violation of federal law is occurring; actually proving an ongoing violation is not necessary. Verizon Maryland, Inc. v. Public Service Commission of Maryland, 535 U.S. 635, 646 (2002) ("[T]he inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim."); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997) ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the Young fiction."); D.T.M. ex rel. McCartney v. Cansler, 383 F. App'x 334, 337-38 (4th Cir. 2010) ("In determining whether the Ex parte Young exception applies, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (internal quotations omitted), ("However, to fall within the Ex parte Young exception, it is sufficient for Plaintiffs' suit to allege an ongoing violation of federal law; actually proving such an ongoing violation is unnecessary.") (emphasis in original); see also 17A MOORE'S FEDERAL PRACTICE – CIVIL, Suits Against State Offices, § 123.40[1][3][a][iii] ("The Ex parte Young exception to Eleventh Amendment immunity applies only when an ongoing violation of federal law is alleged . . . Whether state officials are *actually* violating federal law is a merits question, not a question of Eleventh Amendment immunity.") (underlined emphasis added, italicized emphasis in original).

Here, Defendants are sued in their official capacity only. Compl., Doc. 1 at 1 (Caption), ¶ 8 ("Defendant George E. Schaefer . . . is sued in his official capacity only."), ¶ 9 ("Defendant Jacqueline C. Smith . . . is sued in her official capacity only."). Accordingly, this is only an "official capacity case," as opposed to an individual capacity case involving personal wrongdoing or supervisory liability.[8]

Defendants argued that they cannot be subjected to section 1983 liability, because there is no evidence of ongoing violations of federal law. Such an argument is misplaced. Plaintiff's complaint pleaded ongoing violations of federal law and asked for declaratory and injunctive relief to prevent future violations. Plaintiff did not ask for damages,[9] only declaratory[10] and injunctive relief. Accordingly, Plaintiff's lawsuit properly brings the instant claims against Defendants as section 1983 persons.

### iii. "Color of State Law"

An official acts under color of stat law where he or she performs state action. West v. Atkins, 487 U.S. 42, 49-50 (1988). Defendants are duly elected state officials under the Constitution of Virginia and have the authority to create policies and sanction customs in their offices. The practices and customs at issue in this case were the result of Defendants using their

---

[8] A section 1983 defendant can be held liable, under the appropriate circumstances, in his official capacity or individual capacity for his own personal wrongdoing or supervisory wrongdoing. See Clark v. Maryland Dep't of Public Safety and Correctional Services, 316 F. App'x 279, 282 (4th Cir. 2009). An action against an official in their official capacity is, in fact, a suit against the entity for which the official was acting. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). However, an action against an official in their personal capacity is a suit against that person only, for illegal actions the official personally committed or actions committed as a supervisor. E.g., Clark, 316 F. App'x at 282 ("these [state] administrators are liable in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms [due to Eleventh Amendment immunity for claims for damages against defendants in their official capacities]."). Supervisory liability, unlike official capacity liability, is personal liability for injuries inflicted by the official's subordinates, based on the official's supervisory indifference or tacit authorization of illegal conduct. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

[9] Although Plaintiff requests attorney's fees, attorney's fees awarded under 42 U.S.C. § 1988 are not considered legal damages prohibited by the Eleventh Amendment to the United States Constitution. Hutto v. Finney, 467 U.S. 678, 691-92 (1978).

[10] Declaratory judgment is within the Ex parte Young exception. See Green v. Mansour, 474 U.S. 64 (1985).

powers bestowed upon them by virtue of their state office. Indeed, Defendants exercised their power "possessed by virtue of state law and made possible only because the [Defendants are] clothed with the authority of state law." West, 487 U.S. at 49. Further, neither Defendant suggest that any relevant act or omission was committed not under color of state law.

Accordingly, Plaintiff proved that Defendants acted under color of state law in this case.

*iv. Policy, Custom, or Practice*

Defendants argue that there is no evidence of an official custom, policy, or practice to support section 1983 liability. A policy, custom or practice can be proved in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

Lytle, 326 F.3d at 471 (internal quotations omitted). "An official policy . . . must be contrasted with 'episodic exercises of discretion in the operational details of government.'" Semple v. City of Moundsville, 195 F.3d 708, 712 (4th Cir. 1999) (quoting Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987)). Outside of formal decision making, a custom may arise if a practice is so "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (quoting Monell, 436 U.S. at 691).

The delays in access at the Prince William and Norfolk Circuit Courts during the relevant period resulted from customs and practices implemented by Defendants or their employees acting on their behalf, which created "a practice that [was] so persistent and widespread as to constitute a custom or usage with the force of law." Lytle, 326 F.3d at 471. These practices and customs include only making newly filed civil complaints available after full administrative indexing and

scanning, and delayed making the great majority of newly-filed civil complaints available on the date of filing in most circumstances. Statistical evidence at trial showed an unacceptable number of newly filed civil complaints were not made publicly available until after the day it was filed. A significant number of newly filed civil complaints were not publicly available until two or more court days after filing. This unacceptable level of access pervaded both Clerks' Offices for a six-month period in 2018, until Plaintiff filed this lawsuit; thus, it is more than mere "episodic exercises of discretion." Semple, 195 F.3d at 712. This level of access occurred consistently, undisturbed for a six-month period,[11] until a lawsuit was filed. Thus, the delays in access are "persistent and widespread" conduct constituting a practice or custom actionable under section 1983. Carter, 164 F.3d at 218.

Evidence at trial also showed that both clerks displayed written signs directed at restricting public and press access to newly filed civil complaints. In Norfolk, a sign that reads "Officers of the Court" is displayed above the door between the public area and the clerk's office. This sign makes no reference to the Norfolk Clerk's policy of allowing credentialed media into the clerk's office.[12] In Prince William County, the sign indicated that the clerks would scan (and thereby make publicly available) civil filings within ten (10) days. This sign makes no reference to the Prince William Clerk's claimed caveat that the sign only refers to civil filings after an initial filing.

Accordingly, Plaintiff proved that the deprivation of a federally protected right was the result of a practice or custom pursuant to section 1983. Therefore, the Court **FINDS** that Plaintiff has proved the elements to establish liability under 42 U.S.C. § 1983.

---

[11] The Court observes that no data is in the bench trial record of the levels of access before January 2018. However, the Court has no reason to believe that it would be materially different than the data offered at trial. See Trial Tr. 63:16-64:8 (Girdner) (describing substantial delays beginning in the fall of 2017).

[12] This is not to say that the Clerks must allow any member of the press or public behind their counters. However, the Court finds that the Norfolk Clerk's claimed "policy" is of little help or relevance to this case where it is unwritten and unposted such that the only people who know about it are the clerks and frequent guests from the media.

## C. WHETHER THERE IS A FIRST AMENDMENT RIGHT TO ACCESS NEWLY-FILED CIVIL COMPLAINTS

It is clear that, as a matter of federal law, the public has a right to access judicial records and documents. The public's right to access judicial records stems from two (2) sources: the common law and the First Amendment to the United States Constitution. Level 3 Comm's LLC v. Limelight Networks. Inc., 611 F. Supp. 2d 572, 577-78 (E.D. Va. 2009). The common law right presumes public access to all judicial records, but that presumption can be rebutted where other interests, such as sensitive commercial information, outweigh the public's interest. Va. Dep't of State Police v. Wash. Post. 386 F.3d 567, 577 (4th Cir. 2004). It is undisputed that the federal common law provides a right of access to newly-filed civil complaints. However, the question in this case is whether the First Amendment also provides a right of access to newly-filed civil complaints.

### i. Whether the First Amendment Guarantees a Right of Access

### (1) Other Federal Courts' Holdings

Before undertaking its own analysis of the applicability of the First Amendment to this case, the Court observes that each federal court to reach this question[13] have found that the First Amendment applies in similar cases filed by this Plaintiff and another. E.g., Courthouse News Service v. Planet, 947 F.3d 581, 2020 WL 253562, 2020 U.S. App. LEXIS 1578 (9th Cir. Jan. 17, 2020) ("As we held in Planet I, and as the district court correctly concluded, a qualified First Amendment right of access extends to timely access to newly filed civil complaints.") ("Planet I");

---

[13] The United States Court of Appeals for the Seventh Circuit denied relief to Plaintiff on abstention grounds. Courthouse News Serv. v. Brown, 908 F.3d 1063 (7th Cir. 2018), cert. denied 140 S.Ct. 384 (Mem), 2019 WL 5150484. The Seventh Circuit did not hold that the First Amendment is inapplicable. Id. Even the district court in Yamasaki, the only other court to deny relief to Plaintiff, acknowledged that, under Ninth Circuit precedent, there is a First Amendment right of access to newly-filed civil complaints. Courthouse News Service v. Yamasaki, 312 F. Supp. 3d 844, 860 (C.D. Cal. 2018) (going on to find that the facts before the court did not constitute a violation of that right).

Courthouse News Service v. Planet, 750 F.3d 776, 788 (9th Cir. 2014) (describing Courthouse News Service's First Amendment claim as "cognizable") ("Planet II"); Bernstein v. Bernstein Litowitz & Grossman LLP, 814 F.3d 132, 141 (2d Cir. 2016); Courthouse News Service v. Brown, 2018 WL 318485 (N.D. Ill. Jan. 8, 2018), rev'd on other grounds by 908 F.3d 1063 (7th Cir. 2018); Courthouse News Service v. Yamasaki, 312 F. Supp. 3d 844, 860 (C.D. Cal. 2018) (going on to find that the facts before the Court did not constitute a violation of the First Amendment right); Courthouse News Service v. Tingling, 16 Civ. 8742, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (recognizing that the Second Circuit found a First Amendment right in Berstein, issuing a preliminary injunction under that First Amendment right), Transcript Proceeding, Order Reported at 16 Civ. 8742, 2016 WL 8505086 (S.D.N.Y. Dec. 16, 2016); Courthouse News Service v. Planet, Case No.: CV 11-08083, 2016 WL 4157210, at *11 (C.D. Cal. May 26, 2016) ("Planet III"); Bernstein v. Bernstein Litowitz Berger & Grossmann LLP, 14-CV-6867, 2016 WL 1071107, (S.D.N.Y. March 18, 2016), aff'd 814 F.3d 132 (2d Cir. 2016); Courthouse News Service v. Jackson, Civil Action No. H-09-1844, 2009 WL 2163609, at *5 (S.D. Tex. July 20, 2009). Although the federal courts' unanimity is good evidence that the First Amendment applies to this case, the Court will also apply its own analysis.

(2)     This Courts' Analysis

The Supreme Court first recognized that the First Amendment guarantees some right to access judicial proceedings in Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980) (recognizing a First Amendment right to access criminal trials). However, it is clear that the First Amendment, unlike the common law, does not apply all judicial records and proceedings. Va. Dep't of State Police, 386 F.3d at 580 ("[W]e have never held that the public has a First Amendment right of access to a pretrial hearing on a non-dispositive civil motion or to the

transcript of such a hearing."); In re: Mgm't Systs. Corp., 67 F.3d 296, 1995 WL 541623, at *3 (4th Cir. 1995) (Table) ("Neither the Supreme Court nor this Court has ever held that the mere filing of a document triggers the First Amendment guarantee of access."); see also Anderson v. Cryovac. Inc., 805 F.2d 1,13 (1st Cir. 1986) ("History and logic lead us to conclude that there is no presumptive first amendment public right of access to documents submitted to a court in connection with discovery motions."). The First Amendment may apply to certain proceedings and filings both in criminal and civil cases. Doe v. Public Citizen, 749 F.3d 246, 265 (4th Cir. 2014).

To determine whether the First Amendment applies to a particular court process or document, courts in the Fourth Circuit generally apply the "experience and logic" test. E.g., In re: U.S. for an Order Pursuant to 18 U.S.C. section 27Q3(D), 707 F.3d 283, 291 (4th Cir. 2013).[14] The "experience and logic" test has two prongs, both of which must be met to find that the First Amendment guarantees a right of access: (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." Baltimore Sun Co. v. Goetz, 886 F.2d 60, 64 (4th Cir. 1989) (quoting Press–Enterprise Co. v. Superior Court, 478 U.S. 1, 8–10 (1986)).

Beginning with history, the Court should examine whether the place and process have historically been open to the press and general public. Goetz, 886 F.2d at 64. There is no dispute that, historically, courts have openly provided the press and general public with access to civil complaints. All parties agree that a civil complaint is the "opening bell" of civil litigation. There is no evidence in the record to suggest that, historically, complaints have been kept from public

---

[14] In a recent opinion, the Fourth Circuit discussed the First Amendment's applicability in civil cases without using the experience and logic test. In Doe v. Public Citizen, the Fourth Circuit held that docket sheets are "critical components" to the public's access to civil proceedings. 749 F.3d 246, 268 (4th Cir. 2014).

view.[15] Plaintiff cites numerous cases across the country that recognize the public's right to review civil complaints. Doc. 59 at 21 (citing Bernstein v. Bernstein Litowitz Berger & Grossmann LLP 814 F.3d 132, 141 (2d Cir. 2016) (federal court of appeals in New York finds a First Amendment right of access)); Charlottesville Newsp., Inc. v. Berry, 206 S.E.2d 267, 267-68 (Va. 1974) (state Supreme Court of Virginia finding that public has a right to access certain pleadings and proceedings); Langford v. Vanderbilt Univ., 287 S.W.2d 32, 36 (Tenn. 1956) (state Supreme Court of Tennessee finding that the "press has for time out of mind published [] contents of a pleading.")). At trial, Plaintiff's CEO, Mr. Girdner, testified to a "tradition" of courts making newly-filed civil complaints available on the same day they were filed. Mr. Schaefer, the Norfolk Clerk, testified that that it had always been his unwritten policy and that of his predecessor to make new civil filings available "behind the counter" and there was evidence that the Prince William Clerk did the same before Ms. Smith took office.

This Court has previously determined that there is no First Amendment right of access to **qui tam** complaints. ACLU v. Holder, 652 F. Supp. 2d 654, 662-63 (E.D. Va. 2009). However, the instant case does not implicate qui tam complaints, rather it implicates newly-filed, general civil complaints. By statute, the peculiar procedure of a qui tam lawsuit[16] must be initiated by a complaint filed in camera. 31 U.S.C. § 3730(b), Erickson ex rel. United States v. Am. Institute of Bio. Scies., 716 F. Supp. 908, 912 (E.D. Va. 1989) ("[Qui tam filing procedures] were adopted primarily to allow the government first to ascertain in private whether it was already investigating

---

[15]In contrast, discovery proceedings and papers, such as interrogatories, requests for production, deposition transcripts, etc. are often conducted outside the public's view.

[16] "Qui tam" is a short-hand name for "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which translates as "who brings the action for the king as well as for himself." E.g., United States ex rel. Stillwell v. Hughes Helicopters, Inc., 714 F. Supp. 1084, 1086 n.1 (C.D. Cal. 1989). In "qui tam" cases under the False Claims Act, a private entity may sue on behalf of the government. 31 U.S.C. § 3730(b). In a qui tam lawsuit, the complaint must be filed under seal for in camera review for at least sixty (60) days and cannot be served on a defendant until the court permits such service. 31 U.S.C. § 3730(b)(2).

the claims stated in the suit and then to consider whether it wished to intervene. S.Rep. No. 345, 99th Cong., 2d Sess. 24, reprinted in 1986 U.S. Code Cong. & Admin. News 5266, 5289. The provisions were also designed to prevent alleged wrongdoers from being tipped off that they were under investigation."). That procedure has been used since 1986 without challenge until Holder. Thus, this Court held that there is no history or experience of public access to newly-filed qui tam complaints. Holder, 652 F. Supp. 2d at 662.

Here, Plaintiff does not challenge access to complaints or other documents which are held under seal pursuant to statute or order or rule of the court. Plaintiff only seeks access to general, civil complaints. As to the complaints at issue here, there is no law or fact cited that suggests that there is a lack of experience of the public's open access to newly-filed civil complaints. Accordingly, the Court **FINDS** that the history prong is satisfied.

Turning to logic, the Court must examine whether public access plays a significant role in the functioning of the particular process in question. Goetz, 886 F.3d at 64. The Fourth Circuit has held that the First Amendment provides the public with a right of access to papers filed in connection with a motion for summary judgment, Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 252-53 (4th Cir. 1988), and judicial opinions which rule on a motion for summary judgment. Doe, 749 F.3d at 267. The First Amendment attaches to these papers, because summary judgment is "an adjudication that serves as a substitute for trial." Id. (internal quotations and citations omitted). Similarly, a complaint frames the issues for trial. It would be difficult for the public to supervise the courts and take part in judicial process without knowing: (1) the parties, (2) alleged facts, (3) the issues for trial, and (4) the relief sought. While summary judgment is a substantive resolution of the dispute; in the same vein, the complaint itself is the dispute. Thus,

access to a complaint plays a significant role in civil litigation, whether the particular procedure is

a motion to dismiss, a motion for summary judgment, trial, or even appeal. As one court observed:

> When a complaint is filed, and the authority of the people of the United States is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends. Logic therefore strongly endorses the historical default that complaints are public documents. Consistent with experience and logic, the presumption of public access to complaints is protected by the First Amendment.

Bernstein v. Bernstein Litowitz Berger & Grossmann LLP, 14-CV-6867, 2016 WL 1071107, at

*9 (S.D.N.Y. March 18, 2016), aff'd 814 F.3d 132 (2d Cir. 2016). Thus, the Court **FINDS** that

the logic prong is met.

Accordingly, the Court **FINDS** that the experience and logic test is satisfied and **FINDS**

that the public and press enjoy a qualified First Amendment right of access to newly-filed civil

complaints unless particular filings are entitled to confidentiality by law.[17, 18]

## ii. Scope of the Right

When the First Amendment applies to the public's right of access to a particular court

document or procedure, the public and press generally have a "contemporaneous right of access."

Doe v. Public Citizen, 749 F.3d 246, 272 (4th Cir. 2014). Indeed, "[e]ach passing day may

constitute a separate and cognizable infringement of the First Amendment." Id. (quoting Grove

Fresh Distribs., Inc. v. Everfresh Juice Co., 24 F.3d 893, 897 (7th Cir. 1994)).

The Fourth Circuit has not defined "contemporaneous" in this context. See id. Black's

Law Dictionary defines "contemporaneous" as "[l]iving, occurring, or existing at the same time."

---

[17] Notwithstanding their trial arguments to the contrary, in early motions practice, Defendants conceded, "[w]hile the Fourth Circuit has not expressly held that the qualified right of access under the First Amendment applies to newly-filed civil complaints, it seems likely that it does given existing precedent." Doc. 20 at 24.

[18] Even if the "critical component" analysis from Doe was used, supra at 30 n.12, the result would be the same. Unlike discovery filings, housekeeping filings, or other minor court papers, the Complaint is significant for a multitude of reasons. Complaints frame the issues for trial and invoke the power of the Court to resolve a dispute. Indeed, to understand subsequent proceedings, reference to the Complaint is often necessary. Accordingly, even under the "critical component" test, the First Amendment applies.

Contemporaneous, BLACK'S LAW DICTIONARY (11th ed. 2019). Webster's Third uses a similar definition,[19] and defines "contemporaneously" as "at or near the same time." Contemporaneous, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE – UNABRIDGED (1986).[20]

Applying that definition to the facts of this case, the Court **FINDS** that the word "contemporaneous" means in this context: **on the same day of filing, insofar as practicable and if not practicable within one court day**. "One court day" means prior to the curtailment of access on the next court day following the filing day.

## D.    WHETHER THE FIRST AMENDMENT RIGHT WAS VIOLATED

### i.  Standard of Review

Although courts are unanimous on the applicability of the First Amendment, the appropriate standard of review is less clear. Clear Fourth Circuit precedent requires the application of strict scrutiny to this case. Doe v. Public Citizen, 749 F.3d 246, 266 (4th Cir. 2014) ("[T]he First Amendment secures a right of access only to particular judicial records and documents . . . and, when it applies, access may be restricted only if closure is necessitated by a compelling government interest and the denial of access is narrowly tailored to serve that interest . . . .") (internal citations and quotations omitted). This follows similar language from the Supreme Court which stated that the qualified First Amendment right may be "overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise Co. v. Superior Court of Cal. For Riverside Cty., 478 U.S.

---

[19] "Contemporaneous" is defined as, "existing or occurring during the same time;" "originating, arising, or being formed or made at the same time : marked by characteristics compatible with such origin." Contemporaneously, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE – UNABRIDGED (1986).

[20] A recent online search of Merriam-Webster's website reveals a nearly identical definition, "existing, occurring, or originating during the same time." Contemporaneous, Merriam-Webster's English Dictionary Online, https://www.merriam-webster.com/dictionary/contemporaneous?src=search-dict-box (last accessed on February 9, 2020).

1, 10 (1986). To survive strict scrutiny, the party seeking to restrict access, here, Defendants, must prove that the restriction is necessitated by a compelling government interest and are narrowly tailored to serve that interest. Doe, 749 F.3d at 266.

Recently, the Ninth Circuit held that claims such as the one before the Court here are subject to the intermediate time, place, and manner review. Courthouse News Service v. Planet, 947 F.3d 581, 595-96 (9th Cir. 2020); see also Globe Newspaper Co. v. Superior Court for Norfolk Cty., 457 U.S. 596, 607 n.17 (1982) ("Of course, limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech . . . would not be subjected to such strict scrutiny."). This intermediate review is "rigorous," but not strict scrutiny. Planet, 947 F.3d at 596. "[I]ncidental delays in access are constitutionally permitted where they are content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." Planet, 947 F.3d at 595. To survive such intermediate scrutiny, the party seeking to restrict access – here, Defendants – must show that the restriction is necessitated by a significant interest, are narrowly tailored to further that interest, and leave open ample alternative channels of communication. Reynolds v. Middleton, 779 F.3d 222, 227 (4th Cir. 2015). Evidence is required to survive intermediate scrutiny, not mere argument. Id. at 229.

Because recent Fourth Circuit precedent requires the application of strict scrutiny, the Court will apply strict scrutiny. The Court notes, however, that both standards of review require Defendants to come forward with evidence, not mere argument, to show that the delays are narrowly tailored to some higher governmental interest. As described infra at section II.D., Defendants cannot satisfy their burden under either test. Accordingly, the Court **FINDS** that even if it were to apply intermediate constitutional review, Defendants' actions resulted in constitutionally deficient access during the relevant time period.

*ii. Discussion*

It is clear that delays in access occurred. These delays in access occurred because of the practices and customs of Defendants. Defendants maintained a practice or custom of scanning complaints only after they were fully indexed and docketed. The levels in access prior to this lawsuit are so inadequate as to constitute a practice or custom of making newly filed civil complaints publicly available in a manner that is not contemporaneous with filing. Therefore, the burden shifts to the Defendant to prove their polices, practices, and customs are narrowly tailored to serve compelling government interests.[21]

Defendants cannot do so. Defendants claim that their interests in the orderly administration of their office and protecting confidential information outweigh the public's First Amendment right to contemporaneous access. The Court first observes that under Virginia law, the filer is responsible for redacting confidential information. E.g., Va. Code § 8.01-420.8(A); 17.1-223(B)(i). Defendants are currently ensuring that confidential information is protected while maintaining contemporaneous access.

Further, Defendants have failed to prove that their practices and customs that lead to the substantial delays in this case were narrowly tailored to serve those government interests. Defendants maintain that they have changed neither staff nor procedures since this lawsuit was filed. Yet, shortly after this lawsuit was filed, both Clerks' Offices experienced a dramatic increase in the civil filings at issue being made publicly available on the same day that they were filed.[22] Both Clerks consistently improved the access they provided to 88% to 90% by the end of the period for which the Court has data. Defendants did not have to hire any new employees or change

---

[21] If the Court were to apply intermediate review, the relevant government interests must be "substantial."
[22] Both Clerks testified that all civil filing work handled in the same manner; therefore, tracing the subset of filings at issue should yield the same results as tracing all civil filings.

their hours to achieve this increased access. Defendants have proven that they are capable of attaining constitutionally adequate access without impairing their interests in the orderly administration of their office and their interest in preventing public disclosure of confidential information.

Accordingly, under either strict or intermediate review, Defendants' practices and customs fail constitutional scrutiny.

## E.     REMEDIES

Plaintiff asks for two (2) remedies in this case: declaratory judgment and an injunction. As described herein and for reasons described on the record, the Court **GRANTS** Plaintiff's motion for declaratory judgment and **DENIES** Plaintiff's motion for an injunction **WITHOUT PREJUDICE**. Plaintiff and Defendant may continue to monitor Defendant's compliance with this Order and this Court will retain jurisdiction pending a report from both parties within six (6) months of the date on this Order.

### *i. Declaratory Judgment*

Declaratory judgment is a remedy that is separate and distinct from other remedies available in the case. 28 U.S.C. § 2201(a). "In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party . . . whether or not further relied is or could be sought." Id. The declaratory judgment statute provides for a remedy; it is not a source of jurisdiction. Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 323 (4th Cir. 1937).

A district court may exercise its jurisdiction over a suit for declaratory judgment when three "essentials" are met:

> (1) the complaint alleges an 'actual controversy' between the parties 'of sufficient immediacy and reality to warrant issuance of a declaratory judgment;' (2) the court

possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction.

Volvo Const. Equipment N.A., Inc. v. CLM Equipment Co., Inc., 386 F.3d 581, 592 (4th Cir. 2004).

Whether to grant declaratory judgment is discretionary. Brillhart v. Excess Ins. Co., 316 U.S. 491, 494 (1942). When exercising its discretion to issue declaratory judgment, a court should consider:

> (1) whether the judgment 'will serve a useful purpose in clarifying the legal relations in issue;' (2) whether the judgment 'will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding;' (3) considerations of federalism, efficiency, and comity; (4) 'whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable.'"

Norfolk Dredging Co. v. Phelps, 433 F. Supp. 2d 718, 722 (E.D. Va. 2006) (quoting Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 422-23 (4th Cir. 1998)).

Here, declaratory judgment is appropriate. The complaint alleges an actual controversy involving deprivation of rights protected by the federal Constitution. Although Plaintiff is no longer experiencing unconstitutional delays, this case is still presents an actual controversy of "sufficient immediacy," because Defendants voluntarily reduced their unlawful conduct and have not provided assurances that they will not resume it. The defense of both Clerks is two-fold: (1) they argue that they did not wrongly deny access and (2) they argue that they incapable of providing the access that the Plaintiff seeks, and that the OES data prove they actually provided, without drastic or unreasonably interruption. The testimony of Mr. Larson and Ms. Elford lead the Court to **FIND** that both Clerks refuse to accept the realty that they are fully capable of providing contemporaneous access. E.g., Trial Tr. 313:18-314:11 (Elford, by deposition). Indeed, the undisputed raw data confirm this conclusion. Same day access was constitutionally deficient

for the first six (6) months of 2018, then, after this lawsuit was filed, both Clerks' Offices saw dramatic increases in access. Thus, the Court concludes that the complaint adequately pleads an actual controversy of sufficient immediacy and reality as to warrant declaratory judgment.

This Court has an independent basis for jurisdiction, as found supra at II.

Further, this Court is within its discretion to grant declaratory judgment. Defendants continue to deny that any First Amendment violations occurred; in fact, Defendants continue to deny that the First Amendment applies to this case at all. Thus, declaratory judgment will be useful and helpful to clarify the legal relationship between Plaintiff and Defendants and eliminate any uncertainty that lead to the filing of this action.

Principles of federalism, efficiency, and comity weigh in favor of issuing a declaratory judgment. State officials, although independently elected under their respective state constitutions, are not at liberty to deny rights guaranteed by the federal Constitution. When state officials do so, deny that it occurred, and deny that the federal Constitution even protects a right, a federal court may, under appropriate circumstances present here, declare the rights of the parties. Such a declaration, when drawn appropriately, does not adversely impact the federal-state balance of sovereignty. Additionally, a declaratory judgment in this case will promote efficiency. The declaratory judgment will clarify the scope of the First Amendment rights of access and clarify the legal relationship between Plaintiff and Defendants.

Finally, there is no evidence that a declaratory judgment is being sought for an improper purpose.

Accordingly, it is **ORDERED, ADJUDGED, AND DECREED**:

1. That the press and public, including Plaintiff, enjoy a qualified right of access to newly-filed civil complaints contemporaneous with the filing of the complaint.

2. That "contemporaneous" in this context means "the same day on which the complaint is filed, insofar as is practicable;" and, when not practicable, on the next court date. "The next court date" is defined as a time prior to the curtailment of access on the first day following the paper's filing when the Clerk's Office is open for business. Based upon the evidence in this case, including but not limited to the OES statistics, a reasonable expectation is that 85-90% of the new civil filings will be accessible to the public and press on the date of filing.

There will be extraordinary circumstances when the Clerk's Office cannot substantially meet the guidelines established in paragraphs 1 and 2 and others when there is only inconsequential deviation. An attempt to define substantial vis-à-vis inconsequential is impracticable and should be resolved by consultation between the Clerk's Office and the complainant, as took place between Mr. Schaefer's office leadership and the Plaintiff in September 2018.

The public and press are entitled to have news and public information presented in an accurate, fair, and unbiased manner, and to complete their entitlement under the First Amendment in a complete and timely manner as well.

A denial of access or a deliberate delay in the same would be an obvious First Amendment violation, but there is no suggestion that occurred at any time in Norfolk or Prince William County.

While the number of newly-filed civil actions and the deputy clerks assigned to handles them is reflected in the evidence, this ratio is not a major factor in computing guidelines for accessibility. In both Clerk's Offices, the deputy clerks assigned to handling filings have a myriad of other duties which impact some mathematical formula's application. However, a substantial increase in filings or decrease in staff will impact compliance. Improved technology at the OES level will likely moot the access issue. Media, in all of its forms, is the instrument through which

the public, as well as public and private institutions, receive the information upon which the rely in making well informed everyday decisions. To efficiently inform the public, the media must have complete and timely access in our increasingly data-driven decision making.

### ii. Injunction

In order to support a claim for injunction, a plaintiff must prove:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay v. MercExchange, 547 U.S. 388, 391 (2006). Injunctions are not issued as a matter of course, and the district court retains its equitable discretion to deny an injunction, even where a Plaintiff has made the requisite showing. Bethesda Softworks, LLC v. Interplay Entertainment Corp., 452 F. App'x 351,353 (4th Cir. 2011) (quoting Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007)).

Throughout this case, the Court has expressed its reluctance to issue an injunction. This case presents a question of whether it is appropriate for an unelected federal judge to enjoin the actions of an elected state court clerk. Although the Court has the authority to do so, e.g., Ex parte Young, 209 U.S. 123, 159-160 (1908), the Court **FINDS** that it should exercise restraint in so acting.

The Court is not persuaded that the public interest would not be disserved by an injunction. The public has a strong interest in its elected circuit court clerks having the ability to perform their duties in an efficient and cost-effective manner. If the Court were to issue an injunction here, the Clerks may be put in a position of disproportionately endeavoring to comply with this Court's order, rather than responding to the many demands of their offices. Although the public also has a strong interest in the vindication of First Amendment rights, such as the right to access public

documents, the record before the Court shows that Defendants in this case have been trying in good faith to comply with the demands of the First Amendment since this lawsuit was filed. Indeed, since the latter part of 2018, both Clerks have substantially complied with the guidelines in this Order.

In denying an injunction the Court is exercising its equitable discretion. Based on the record and arguments of counsel, the Court is not persuaded that an injunction is appropriate at this time. However, the Court is persuaded that Plaintiff has made a showing that there is a real risk that Defendants, in the absence of an injunction, could revert to their pre-lawsuit practices and customs. Accordingly, the Court will **RETAIN JURISDICTION** over this case. The parties should monitor the levels of access provided by Defendants for six (6) months following the conclusion of the bench trial. No later than August 15, 2020, the parties shall file a joint status report on the level of access provided by Defendants with supporting documents from OES. If the parties cannot agree as to the adequacy of such access, the joint status report should succinctly state each parties' positions. If Plaintiff be so advised, it may renew its motion for a permanent injunction based on (1) the record evidence currently before the Court and (2) any new evidence that comes to light during the six (6) month period. Plaintiff's renewed motion for a permanent injunction grounded upon the foregoing evidence shall be due no later than August 30, 2020.

### III. CERTIFICATE OF APPEALABILITY

At the conclusion of the bench trial, defense counsel made an oral motion for a certificate of appealability. That motion is **GRANTED**.

Pursuant to 28 U.S.C. § 1292(b), the Court **FINDS** that the issues addressed herein involve "controlling question[s] of law as to which there is substantial ground for the difference of opinion and that immediate appeal from this order may materially advance the ultimate termination of the

litigation." 28 U.S.C. § 1292(b). The United States Court of Appeals for the Fourth Circuit, which would have appellate jurisdiction over this case, has never ruled precisely on the questions before the Court. Because this Court will retain jurisdiction over the case, the Court **FINDS** that the instant litigation may be materially advanced if interlocutory review is conducted.

Accordingly, the Court **CERTIFIES** that Defendants may apply to the United States Court of Appeals for the Fourth Circuit for a certificate of appealability of the following questions: (A) whether this case is moot; (B) whether Plaintiff has satisfied the elements required to impose section 1983 liability on Defendants; (C) whether the First Amendment provides a right of access to newly-filed civil complaints; (D) if there is a First Amendment right, was it violated by Defendants; and (E) what remedy, if any, should be granted. Defendants shall apply for such an appeal **no later than ten (10) days after this Opinion and Order is entered**. Both parties are further **ADVISED** that pursuant to 28 U.S.C. § 1292(b), the case before the Court **WILL NOT BE STAYED** by virtue of this certificate, or by virtue of an appeal being granted, unless so ordered by the appellate court.

## IV.  ATTORNEY'S FEES

If Plaintiff intends to move for attorney's fees, its motion for attorney's fees shall be due in a manner consistent with the Court's recent order amending its attorney's fees scheduling order. Doc. 101.

## V.  CONCLUSION

Accordingly, the Court **FINDS AND CONCLUDES** that (1) the First Amendment guarantees a qualified right to access newly-filed civil complaints contemporaneously with their filing, and (2) that during the months of January of 2018 through June of 2018 and for a period of

time thereafter, Defendants deprived Plaintiff of that right. Accordingly, Plaintiff is awarded declaratory judgment consistent with this Opinion and Order.

The Clerk is **REQUESTED** to distribute a copy of this Opinion and Order to counsel of record.

It is **SO ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

Norfolk, Virginia
February 20, 2020

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE