**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | Case No. 2:18-cv-391-HCM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE E. SCHAEFER, in his official | ) | |
| capacity as Clerk of the Circuit Court for | ) | |
| Norfolk, Virginia, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF COURTHOUSE NEWS SERVICE'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS APPLICATION FOR ATTORNEYS' FEES AND COSTS**

## INTRODUCTION

Plaintiff Courthouse News Service ("CNS") filed its complaint in this action in July 2018, after having been denied contemporaneous access to newly-filed civil complaints at the Circuit Court for Norfolk, Virginia ("Norfolk Circuit Court") and the Circuit Court for Prince William County, Virginia ("Prince William Circuit Court"). Although the amount of attorneys' fees and expenses spent to litigate this case was significant, the constitutional issue at stake – the First Amendment right of access to judicial proceedings and documents – is of utmost importance, and the litigation tactics taken by the Defendants prompted more work at every turn.

Contemporaneous access to newly-filed civil complaints, which this Court has defined as "on the same day of filing, insofar as practicable and if not practicable within one court day," February 20, 2020 Opinion and Order ("Opinion"), ECF No. 102, at 35, is important because, as this Court stated: "Legal news, like all other news, has a short shelf-life. Accordingly, it is important for news providers to have contemporaneous access to public documents." Opinion at 2, ¶ 3. *See also* Transcript of Trial Proceedings, February 5, 2020 ("Trial Tr. Vol. 4"), ECF No. 93, at 560:23-561:2 (Judge Morgan: "[I]t has its news value as soon as it happens.… If you don't get it when it's fresh, it's like stale bread or stale anything else.").

Defendants aggressively litigated this case from the beginning, a fact that Defendants' counsel wears as "a badge of honor." Closing Arguments, Trial Tr. Vol. 4, 559:14. From the start of this case, Defendants categorically denied delays in access (which were proven at trial), and seemingly failed to inquire about the existence of the electronic data that proved the delays. Even after CNS acquired that data in January of 2019 – after serving a third party subpoena and subpoena duces tecum upon the Office of Executive Secretary ("OES") and taking the deposition of OES – Defendants failed to make a good faith effort to review that data, focusing instead on

the "red-herring" issue of rescanning in an attempt to undermine that data's most significant element – the date when complaints became public.  Defendants made this litigation as difficult and drawn out and expensive as possible, with the bulk of the fees being incurred after the OES data was provided.

The Court's finding that (i) "the press and public, including Plaintiff, enjoy a qualified right of access to newly-filed civil complaints contemporaneous with the filing of the complaint;" (ii) that contemporaneous means "the same day on which the complaint is filed, insofar as is practicable;" (iii) that "a reasonable expectation is that 85-90% of the new civil filings will be accessible to the public and press on the date of filing;" (iv) that "the Court will RETAIN JURISDICTION over this case;" (v) that "[t]he parties should monitor the levels of access provided by Defendants for six (6) months;" and (vi) that plaintiff "may renew its motion" for injunctive relief if the declaratory relief is not sufficient to alter the Defendants' behavior, Opinion at 40-41, 43, clearly makes CNS a prevailing party.  As a prevailing party, CNS is entitled to reimbursement of its reasonable fees and expenses.  It is well-established that "[t]he purpose of § 1988 is to ensure effective access to judicial process for persons with civil rights grievances."  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)).  Absent the ability to recoup fees, dilatory litigation tactics and an aggressive defense requiring, in turn, an aggressive offense, would force many plaintiffs to drop a case rather than continue to incur the high costs necessary to vindicate protected rights.  Despite resistance at every corner, CNS stayed the course and ultimately prevailed, winning a victory not only for itself but for other news organizations and for the public.  But this victory came at a high cost to CNS – substantially more than what it is seeking to recover through this fee application.  CNS' fee application should be granted in full.

## FACTUAL BACKGROUND

The basic factual background of this litigation is set out in the Court's Opinion, and is only briefly restated here.  These facts establish that CNS is entitled to a full award of the fees being sought for the prosecution of this litigation.

### About Courthouse News Service

CNS is a nationwide news service that reports on all stages of civil litigation in state and federal courts throughout the United States.  Opinion at 2, ¶ 1; *see also* Testimony of William Girdner, Transcript of Trial Proceedings, January 31, 2020 ("Trial Tr. Vol. 1"), ECF No. 96, at 33:14-20, 40:4-5.  CNS has more than 2,200 subscribers nationwide for its subscription-based publications.  Opinion at 2, ¶ 2; *see also* Girdner Testimony, Trial Tr. Vol. 1, 46:11-14.  In addition to law firms, CNS subscribers include news and entertainment media outlets, academic institutions, publicly traded companies, government entities, and non-profit organizations. Opinion at 2, ¶ 2; *see also* Girdner Testimony, Trial Tr. Vol. 1, 46:11-14; Trial Exhibits P-3 (CNS' past and present academic institution subscribers, corporate subscribers, and governmental entity subscribers; admitted); and P-4 (list of CNS' past and present media subscribers; admitted).  CNS' publications include its New Litigation Reports, which contain staff-written summaries of newsworthy new civil complaints, and its free, publicly available website, www.courthousenews.com, which features original news reports and commentary written by CNS staff and which is read by hundreds of thousands of people each month.  Opinion at 2-3, ¶¶ 3-4, 6; Girdner Testimony, Trial Tr. Vol. 1, 33:15-20, 41:6-22, 44:19-45:1, 45:16-46:7; Trial Exhibits P-45 (Sample Virginia Report; admitted); P-46 (Sample Southern Virginia State Report; admitted); and P-27 (homepage for CNS' website, taken from the March 28, 2019 edition; admitted).

**Traditional Access to Newly-Filed Civil Complaints**

Traditionally, members of the press covered new litigation in major metropolitan areas around the country by sending reporters to the courthouse towards the end of each day to review civil complaints that had been filed that day.  Opinion at 3, ¶ 8; Girdner Testimony, Trial Tr. Vol. 1, 34:19-35:10, 36:13-24.  From CNS' founding in 1990, its reporters worked alongside reporters from newspapers and other media, reviewing each day's complaints, which court staff provided to the press as a matter of course before complete administrative processing.  Opinion at 3, ¶ 9; Girdner Testimony, Trial Tr. Vol. 1, 34:25-36:12, 37:6-38:2, 38:16-39:22.  With the decimation of traditional newspapers, it is now common for CNS to be the only member of the press reviewing each day's complaints at a courthouse.  Increasingly, other media outlets now rely on CNS to learn about newly-filed litigation, and CNS has been credited as the original source of reporting by newspapers, legal publications, magazines, television, radio, and online publications.  Opinion at 4, ¶ 11; Girdner Testimony, Trial Tr. Vol. 1, 47:23-48:4, 49:6-50:1.

**CNS' Coverage of the Norfolk and Prince William Circuit Courts**

CNS began covering the Norfolk and Prince William Circuit Courts on a daily basis in September 2017.  Testimony of Ryan Abbott, Transcript of Proceedings, February 3, 2020 ("Trial Tr. Vol. 2"), ECF No. 95, at 253:12-14, 262:6-8.  This daily coverage, along with tracking conducted by the CNS reporters covering these courts, confirmed that there were substantial delays in access to newly-filed civil complaints in those courts.  Girdner Testimony, Trial Tr. Vol. 1, 63:16-64:8.

New civil complaints filed in paper at the Norfolk and Prince William Circuit Courts go through several stages before they can be viewed on the public access terminals: (1) initial intake; (2) Circuit Court Case Management System ("CCMS") data entry or "indexing"; and (3)

scanning.  Opinion at 6-10, ¶¶ 24-38.  It is only after this last stage is complete that complaints can be viewed on the public access terminals located in the clerks' offices.  *Id.* at 8, ¶ 29; 10, ¶ 37.  During the Relevant Period, the Norfolk and Prince William Clerks' Offices' policies, customs, and practices were to make new complaints available only on the public access terminals – after the completion of initial intake, indexing, and scanning.  Opinion at 11, ¶¶ 42, 45.  Despite explicit requests from CNS to members of the Norfolk and Prince William Circuit Court Clerks' staff, CNS was denied access to complaints that had not been fully processed and posted to the public access terminals until after this lawsuit was filed.  Opinion at 10-12, ¶¶ 39-40, 42, 48-49; *see also* Abbott Testimony, Trial Tr. Vol. 2, 258:8-23, 263:14-265:1.

After CNS filed this lawsuit, the Norfolk and Prince William Clerks denied that the delays in this case ever occurred, but inconsistently asserted that their offices could not provide same-day access to complaints without disrupting business operations.  But, at the time of trial and for months following the filing of this case, they were doing just that.  Opinion at 13, ¶ 52 (citing Defendants' Answer, ECF No. 52).

## PROCEDURAL BACKGROUND

After being denied access to newly-filed civil complaints in the Norfolk and Prince William Circuit Courts, and confirming, through tracking, that delays in access existed during the period at issue in the Complaint, January 1, 2018 through June 30, 2018 (the "Relevant Period"), CNS filed suit against George E. Schaefer, in his official capacity as Clerk of the Norfolk Circuit Court, and Jacqueline C. Smith, in her official capacity as Clerk of the Prince William Circuit Court, alleging delays in access and a violation of the First Amendment right to contemporaneous access.  *See* Complaint, ECF No. 1.  In response, Defendants steadfastly

denied the delays and aggressively litigated this case, including filing two motions to dismiss, engaging in extensive discovery, and filing a voluminous summary judgment motion.

### CNS' Preliminary Injunction Motion

The day after filing the Complaint, CNS filed a Motion for a Preliminary Injunction. ECF Nos. 4, 5.  In opposing that motion, Defendants denied delays in access and asserted that they had "compelling evidence that newly-filed complaints are ordinarily made accessible to the public on the same business day they are received for filing."  ECF No. 20 at 2.  Given the Defendants' denial of delays, and in the interest of judicial economy, CNS withdrew its Motion for a Preliminary Injunction.  ECF No. 26; Declaration of William Hibsher ("Hibsher Decl."), ¶ 41.  CNS is not seeking attorneys' fees for the Preliminary Injunction Motion, among several other reductions that CNS has made.  *See infra* at pp. 22-24 (Argument Section B.2).

### Defendants' Motion to Dismiss

Defendants filed a Motion to Dismiss in August 2018.  ECF Nos. 21, 22.  In moving for dismissal, Defendants argued that CNS failed to name OES, which Defendants asserted was a necessary and indispensable party, and that the Prince William Clerk was misjoined in the lawsuit, making venue improper.  Five months later, while Defendants' first motion to dismiss was still pending, and after extensive discovery had already occurred, Defendants filed a Motion for Abstention.  ECF Nos. 35, 36.  CNS opposed both motions.  ECF Nos. 27, 43.  The Court held a hearing on the motions on March 13, 2019, and denied both in a ruling from the bench, followed by a written Opinion.  ECF No. 48.  *See also* Hibsher Decl., ¶¶ 42-45.

### Extensive and Expensive Discovery

The parties engaged in extensive discovery, including requests for the production of documents, interrogatories, requests for admission, and thirteen depositions.  *See generally*

Hibsher Decl., ¶¶ 64-108.  Defendants focused much of their discovery on the nature of CNS' business, details regarding the denials in access, the timing of events leading to the lawsuit, and CNS' tracking.  Responding to both Defendants' written discovery – five sets of interrogatories (Schaefer 3, Smith 2); four sets of requests for the production of documents (Schaefer 2, Smith 2); and two requests for admission (Schaefer 1, Smith 1) – took significant time to investigate, analyze, and draft.[1]  *Id.* ¶¶ 69, 95-106.  In addition, Defendants took four depositions – three fact and one 30(b)(6) – which also required significant time for preparation and defense.  *Id.* ¶ 108. The discovery propounded by CNS was necessary in order to establish that Defendants had policies, customs, and practices that resulted in delayed access to newly-filed civil complaints. *Id.* ¶ 65.  In response to numerous discovery requests, Defendants denied the existence of such policies, customs, and practices, denied the existence of any data that could establish the processing times for civil complaints, and also flatly denied any delays in access.  *See id.*[2]

Given Defendants' claims about "compelling evidence that newly-filed complaints are ordinarily made accessible to the public on the same business day they are received for filing," Defendants Opposition to CNS' Motion for Preliminary Injunction, ECF No. 20, at 2, a key focus of the discovery was determining whether data existed that showed processing dates and times for newly-filed civil complaints.  In response to several requests for such documents and information, Defendants repeatedly stated "None."  Hibsher Decl., ¶¶ 73-78.  And, despite the voluminous document productions made by Defendants, no such statistical processing data was produced.  *Id.* ¶ 86.  Defendants claimed to have "requested information" from OES, but the additional documents Defendants produced did not establish when newly-filed civil complaints

---

[1]  In response to Defendants' requests for the production of documents, CNS produced over 8,650 pages of documents.  Hibsher Decl., ¶ 106.

[2]  In response to the document requests propounded by CNS, Mr. Schaefer produced over 6,200 pages of documents and Ms. Smith produced over 3,200 pages of documents.  *Id.* ¶ 86.

were scanned and made available to the public. *Id.* ¶¶ 77-78. Thus, CNS had to resort to third party discovery and, in November 2018, served a subpoena and subpoena duces tecum upon counsel for OES. *Id.* ¶¶ 87-89.

While OES produced some responsive information on December 14 and 18, 2018, the documents produced still did not include data on when new paper civil complaints were scanned into the Case Imaging System ("CIS") or made available for viewing to the public. *Id.* ¶¶ 90-91. Instead, OES provided data for the dates and times when the data (and not the images) were made available. *Id.* It was during the December 19, 2018 deposition of Robert Smith, OES' designee and then-director of Judicial Information and Technology, that CNS learned for the first time – in response to pointed and repeated questioning – that OES "track[s] when documents are scanned" and that OES "can give you reports of when – of when every image was scanned, but we cannot tell you when the first image to a case was scanned." Testimony of Robert Smith, read in to record, Transcript of Proceedings, February 4, 2020 ("Trial Tr. Vol. 3"), ECF No. 94, at 413:5-16, 414:25-415:2.[3] It then took OES another month to produce a new spreadsheet that included two columns of data not seen by CNS before: "DateTime_Available_In_CIS" (Column 11) and "DateTime_Documents_Available_To_Public" (Column 14), containing the essential data on when documents are made public. Hibsher Decl., ¶ 93.

**Retention of an Expert**

Since Defendants continued to dispute the existence of the delays, CNS retained a data analysis expert to review and analyze the OES data and to calculate the delays. *Id.* ¶¶ 109-11. Amita Kancherla, a Director at Alvarez & Marsal Disputes and Investigations LLC, prepared an

---

[3] As discussed below, Defendants used this testimony to support their "rescanning" argument, which this Court noted "is an exercise in futility. Or obfuscation, whatever you want to call it," Trial Tr. Vol. 2, 242:16-18, and that it "appears to be a red herring." Trial Tr. Vol. 4, 591:25-592:1.

Expert Report and a Rebuttal Expert Report (to counter the conclusory statements made in Defendants' expert's reports). *Id.* ¶¶ 110, 112. To conduct her analysis and calculation, Ms. Kancherla reviewed the OES data and compared it with CNS' tracking data. She interviewed the CNS reporters who covered the Norfolk and Prince William Circuit Courts, traveled to the Norfolk and Prince William Circuit Courts to review complaints on the public access terminals, and reviewed all deposition transcripts and relevant documents. *Id.* ¶ 115. In calculating delays in access, Ms. Kancherla used the OES data provided in the columns titled "File_Date," for the start of the delay calculation, and "DateTime_Documents_Available_To_Public" (*i.e.*, the scan date), for the end date. Testimony of Amita Kancherla, Trial Tr. Vol. 2, 182:13-18, 185:10-13. The Court found that "Ms. Kancherla's opinions are entitled to significant weight and are reasonably consistent with the OES statistics." Opinion at 17, ¶ 62.

**Cross-Motions for Summary Judgment**

On April 26, 2019, the parties filed voluminous cross-motions for summary judgment. *See* Hibsher Decl., ¶¶ 46-49. While CNS relied on the analysis and calculations of Ms. Kancherla to support its allegations of delayed access, Defendants and their expert rejected the data provided in the "DateTime_Documents_Available_To_Public" column as "unreliable" due to the possibility of rescanning, which if occurring on a date after the original scan could change the date available. But, the Defendants' own testimony was uniform that rescanning rarely occurred. Opinion at 15, ¶ 55(f); *see also* Testimony of Tom Larson, Trial Tr. Vol. 1, 118:24-119:1, 120:13-25; Testimony of Brenda Elford, Trial Tr. Vol. 2, 316:11-13. As the Court noted at trial: "[I]t doesn't appear to me that rescanning has anything to do with the case." Trial Tr. Vol. 2, 242:14-15.

**Final Pretrial Conference**

At the January 16, 2020 Final Pretrial Conference, the Court heard argument on the summary judgment motions and stated that it was "persuaded that [CNS has] the First Amendment right and that [it is] entitled to some form of relief" and encouraged the parties to avoid trial and "resolve everything but attorneys' fees."  January 16, 2020 Hearing Transcript ("Jan. 16 Tr."), ECF No. 75, at 38:18-22, 49:19-21.  While CNS was amenable to the Court's suggested declaration – That CNS has "a First Amendment right to contemporaneous access to all civil cases," with "contemporaneous meaning on the date that they're filed insofar as that's practicable," *id.* at 37:21-25 – following the hearing, Defendants informed CNS that they would not accept the Court's declaratory judgment language.  Hibsher Decl., ¶¶ 56-57.  As a result, trial proceeded on January 31, 2020, and continued for four days.

## ARGUMENT AND AUTHORITY

I. **CNS is a Prevailing Party and is Entitled to Attorneys' Fees and Costs**

"In any action or proceeding to enforce a provision of [section 1983] … the court, in its discretion, may allow the prevailing party … a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  "[T]he Supreme Court has held that a prevailing party should '*ordinarily* recover an attorney's fee *unless special circumstances* would render such an award unjust.'"  *Brandon v. Guilford Cty. Bd. of Elections*, 921 F.3d 194, 198 (4th Cir. 2019) (quoting *Hensley*, 461 U.S. at 429).  The Supreme Court has also "concluded that a court's discretion to deny a fee award to a prevailing plaintiff is narrow."  *Brandon*, 921 F.3d at 198 (internal quotations and citations omitted).  And, the Fourth Circuit has held that "only on rare occasions" does a case present special circumstances that warrant a denial of attorney's fees to a prevailing party.  *Lefemine v. Wideman*, 758 F.3d 551, 555 (4th Cir. 2014) (internal quotations and citations omitted).

10

Here, as the Court stated in its ruling from the bench on February 5, 2020, CNS "is entitled to attorney's fees." Trial Tr. Vol. 4, 594:11-12. *See also* Minutes of Proceedings, February 5, 2020, ECF No. 92. "A plaintiff 'prevails,' [the Supreme Court] ha[s] held, 'when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.'" *Lefemine v. Wideman,* 568 U.S. 1, 4 (2012) (quoting *Farrar v. Hobby,* 506 U.S. 103, 111-12 (1992)). Given the result in this case – a declaration that "the First Amendment guarantees a qualified right to access newly-filed civil complaints contemporaneously with their filing," that contemporaneous means "the same day on which the complaint is filed, insofar as is practicable," and that "a reasonable expectation is that 85-90% of the new civil filings will be accessible to the public and press on the date of filing;" the Court's retention of jurisdiction and Order that the parties monitor access and report back to the Court in six (6) months regarding Defendants' compliance; and CNS' retaining the right to renew its motion for preliminary injunction because "the Court is persuaded that Plaintiff has made a showing that there is a real risk that Defendants, in the absence of an injunction, could revert to their pre-lawsuit practices and customs" – there is no doubt that CNS is the "prevailing party." Opinion at 40-41, 43-44.[4]

The Fourth Circuit has held that "awarding counsel fees to prevailing plaintiffs in civil rights litigation against government entities and officials is particularly important and necessary if [f]ederal civil and constitutional rights are to be adequately protected." *Lefemine*, 758 F.3d at 558 (citations omitted). *See also Brandon*, 921 F.3d at 199-200 (holding that "[t]he purpose of fee shifting is *not to punish* those responsible for promulgating unconstitutional laws, but rather to enable potential plaintiffs to obtain the assistance of competent counsel in vindicating their

---

[4] The Supreme Court "ha[s] repeatedly held that an injunction or declaratory judgment, like a damages award, will usually satisfy that [prevailing party] test." *Lefemine,* 568 U.S. at 4.

rights" and that "[e]nabling civil rights plaintiffs to have access to courts to enjoin enforcement of unconstitutional laws furthers the national policy of facilitating the redress of civil rights grievances…"). That is especially true here, as the balance of equities strongly favors a fee award. Prior to this lawsuit, Defendants denied access to newly-filed civil complaints prior to complete administrative processing when requested by CNS' Southeast Bureau Chief, and, for over a year and a half after this case was filed, Defendants did all they could to stymie the First Amendment right of access. Moreover, as CNS' Editor and Founder testified, CNS is a surrogate for the media and this result inures to the benefit of all the media as well as the public. As a result, no special circumstances could render an award of fees unjust in this case.

## II.    **A Full Award of Attorneys' Fees is Appropriate**

Courts in the Fourth Circuit analyze applications for attorneys' fees under the well-known *Lodestar* approach. "In calculating an award of attorney's fees, a court must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). In determining what constitutes a "reasonable" number of hours and a "reasonable" rate, the Fourth Circuit has instructed that the following twelve factors should guide the district court in using its discretion:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Id.* at 243-44 (quoting *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)

(adopting twelve factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th

Cir. 1974), *abrogated on other grounds by, Blanchard v. Bergeron,* 489 U.S. 87 (1989))).[5] Once

the court has determined the lodestar figure, it should subtract fees for hours spent on

unsuccessful *claims* that are *unrelated* to successful ones.[6] *Robinson*, 560 F.3d at 244 (emphasis

supplied).   As a final step, the court "then awards some percentage of the remaining amount,

depending on the degree of success enjoyed by the plaintiff." *Id.* (citation omitted).   In this case,

application of the *Lodestar* factors demonstrates that a full award of attorneys' fees is appropriate

for the single claim brought by CNS – particularly in light of the fee reductions voluntarily made

by CNS. *See infra* at pp. 22-24 (Argument Section B.2).

　　　CNS seeks $2,258,505.83 in attorneys' fees and costs from April 1, 2018 through

February 28, 2020.   Of that amount, $2,025,946.00 is for attorneys' fees, a lodestar based on

3,541.50 hours over approximately 23 months at the discounted rates that were charged to CNS,

and $232,559.83 is for costs.   More specifically, CNS is claiming: (1) $1,890,198.50 in fees

---

[5]   In determining the reasonableness of the hourly rate and the number of hours billed, "the court need not address in detail every single one of these factors." *S. Bank & Trust Co. v. Pride Group, LLC*, Case No. 14-cv-255, 2015 WL 410726, at *9 (E.D. Va. Jan. 28, 2015).

[6]   CNS brought only one claim in in this lawsuit – violation of the First Amendment and 42 U.S.C. § 1983 for denying contemporaneous access to civil complaints, ECF No. 1, at 17-18 – and CNS prevailed on that claim.   The requests for a declaratory judgment and an injunction were not separate causes of action, but simply alternative relief being sought by CNS for the claimed violation. *See CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 55-56 (4th Cir. 2011) ("The Declaratory Judgment Act does not 'create[ ] any substantive rights' or provide a standalone cause of action.") (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)); *CSR, Inc. v. Foster-Bey*, Case. No. 1:16-CV-1227 (JCC/IDD), 2017 WL 1929439, at *4 (E.D. Va. May 10, 2017) ("[T]he Declaratory Judgment Act ... does not create a substantive cause of action.") (quoting *Dallas Cty., Tex. v. MERSCORP, Inc.*, 2 F. Supp. 3d 938, 945 (N.D. Tex. 2014), *aff'd sub nom. Harris Cty. Texas v. MERSCORP Inc.*, 791 F.3d 545 (5th Cir. 2015)); *Blankenship v. Consolidation Coal Co.*, 850 F.3d 630, 640 (4th Cir. 2017) ("Injunctive relief is a remedy, not a cause of action.").

incurred prior to the conclusion of trial on February 5, 2020;[7] (2) $135,747.50 in fees incurred after the conclusion of trial on the present fee motion and accompanying declarations;[8] and (3) $232,559.83 in non-taxable costs.[9]  In support of this fee application, CNS submits, *inter alia*, (1) detailed, contemporaneous billing records, Hibsher Decl., Exs. E, F; Shumadine Decl.", Ex. 1; (2) a summary of rates and hours per timekeeper, Hibsher Decl., ¶¶ 137, 140; (3) a summary of experience and qualifications for each timekeeper, *id.* ¶¶ 6-36; (4) and a declaration from Robert M. Tata, Esq., the Managing Partner for the Norfolk office of Hunton Andrews Kurth, explaining the basis for his view that "the attorneys' fees and costs incurred by CNS in the course of obtaining judgment at trial were reasonable in light of the facts of circumstances of this case."  Tata Decl., ¶ 47.

### A.    The Hourly Rates Charged to CNS are Reasonable (Factors 5, 9, 11, and 12)

CNS seeks a fee award based on the hourly rates it actually paid its lawyers, which are reasonable and are the normal rates paid by CNS.  Hibsher Decl., ¶¶ 134-36; Declaration of Rachel Matteo-Boehm ("Matteo-Boehm Decl."), ¶¶ 9-13; Shumadine Decl. ¶ 24.  CNS has worked with Matteo-Boehm for almost 20 years, and has been a client of Bryan Cave Leighton Paisner LLP ("BCLP") since Matteo-Boehm and several of her colleagues who also work on CNS access matters joined BCLP approximately eight years ago.  Matteo-Boehm Decl., ¶ 3.  In

---

[7]  For the April 1, 2018 through February 5, 2020 time period, $1,750,021.50 was billed by BCLP and $140,177.00 was billed by Willcox & Savage.  *See* Hibsher Decl., Ex. E; *see also* Declaration of Conrad M. Shumadine ("Shumadine Decl."), Ex. 1.

[8]  This includes work performed between February 6, 2020 and February 28, 2020 by BCLP (amounting to $72,821.50) and Willcox & Savage ($8,842.00), and work performed through February 29, 2020 by Hunton Andrews Kurth ($54,084.00).  *See* Hibsher Decl., Ex. F; *see also* Shumadine Declaration, Ex. 1; Declaration of Robert M. Tata ("Tata Decl."), Ex. A.

[9]  Of this amount, $194,333.58 is related to work performed by Ms. Kancherla and Alvarez & Marsal, and $38,226.25 is related to travel and other expenses reasonably incurred in connection with the litigation.  *See* Hibsher Decl., Exs. D and G.

its many years of representing CNS, BCLP has developed expertise in the First Amendment right of access to newly-filed civil complaints, and provides CNS with discounted billing rates. *Id.* ¶¶ 4-6. William Hibsher, a 1974 law school graduate, billed CNS at a rate of $734; Heather Goldman, a 2008 law school graduate and former journalist, billed CNS at a rate of $594; Bryan Harrison, a 2010 law school graduate and former federal law clerk, billed CNS at a rate of $545;[10] and Conrad Shumadine, a 1967 law school graduate, billed CNS at a rate of $450. For the purposes of this fee application, CNS is seeking the following rates: Hibsher - $730; Goldman - $590; Harrison - $545; and Shumadine - $450.

The requirement that an attorney's rate is reasonable "is met by compensating attorneys at the prevailing market rates in the relevant community." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (citations omitted). According to Mr. Tata, "the hourly rates charged were within the range of prevailing market rates in this district and this division for professionals of similar experience and ability and paraprofessionals offering similar litigation-related services." Tata Decl., ¶ 37. Tata came to this conclusion based upon his "personal experience as a litigator" and "inquiries with other litigators of similar experience levels in specialized federal litigation." *Id.* As detailed in the Tata declaration, this Court recently approved a total fee award of over $2.4 million including a partner rate of $740 per hour. *See Cobalt Boats v. Brunswick Corp.*, 296 F. Supp. 3d 791 (E.D. Va. 2017), *rev'd on other grounds*, 773 F. App'x 611 (Fed. Cir. 2019). *See also* Tata Decl. ¶ 41.

---

[10] These rates reflect a discount from the standard rates of at least ten percent for all BCLP timekeepers. Matteo-Boehm Decl., ¶ 6.

1. *The Fees Sought are not Theoretical; They were Actually Paid by CNS*

All fees for time reflected in the lodestar through December 2019 **were** paid by CNS. Matteo-Boehm Decl., ¶ 10.[11]  It is well-established in the Fourth Circuit that the fees actually paid by a client to the petitioning attorney for the services rendered is competent evidence to establish the prevailing market rate for the attorney's services.  *Robinson*, 560 F.3d at 244 ("The market rate should be determined by evidence of what attorneys earn from paying clients for similar services in similar circumstances, which of course, may include evidence of what the [petitioning] attorney actually charged his client.") (citations omitted).  *See also United States for use & benefit of Engineered Servs., Inc. v. Hanover, Ins. Co.*, Case No. 14-cv-21, 2015 WL 13308583, at *6 (E.D. Va. Mar. 11, 2015) ("[B]ecause [plaintiff] has already paid the fees, a full recovery will not result in any windfall to [the plaintiff].  In short, [plaintiff's] counsel's hours billed are reasonable notwithstanding the amount in controversy."); *Sonoco Prod. Co. v. Guven*, 12-cv-00790, 2015 WL 127990, at *15 (D.S.C. Jan. 8, 2015) (finding an award of attorney's fees reasonable because "this is the amount billed and actually paid by [the plaintiff]."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 773-74 (7th Cir. 2010) (The amounts sought "'are not pie-in-the-sky numbers that one litigant seeks to collect from a stranger but would never dream of paying itself.  These are bills that [plaintiff] *actually* paid in the ordinary course of its business.'") (citations omitted); *Hensley,* 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.").

---

[11] CNS has been billed for the period January 1, 2020 through January 31, 2020, and BCLP expects to be paid in full in the usual course.  Matteo-Boehm Decl., ¶ 11.  CNS has not yet been billed for the period February 1, 2020 to the filing of this application for an award of attorneys' fees, but a billing invoice will be submitted in the usual course for payment, and BCLP expects to be paid in full in the usual course.  *Id.* ¶ 12.  *See also* Shumadine Decl., ¶ 24.

16

2.    *CNS' Counsel Choice was Appropriate Given the Importance of the Issues and Counsel's Experience and Long Representation of CNS*

Challenging Defendants' policy of denying access until after intake, indexing, and scanning was crucial for CNS – to preserve its ability to function effectively as a news service, to protect the ability of the press and the public to know about civil litigation, and to protect the judiciary.  As CNS' Founder and Editor testified:

> Our reports are more valuable because they're timely.  We're harmed when they're late, when we're reporting on late cases. Our reputation is built on speed and thoroughness. So the reports are less valuable to the subscribers. I think they're less valuable to the subscribers because they're late.  And I, I believe it's harmful to the court, a veil put on the court, so that they're less open.

Girdner Testimony, Trial Tr. Vol. 1, 59:1-7.

Given the important First Amendment rights at stake, it was appropriate for CNS to engage counsel with expertise in First Amendment law and national-firm resources, especially since CNS' attorneys had represented CNS in court-record access issues for almost a decade before the lawsuit was filed.[12]  Matteo-Boehm Decl., ¶¶ 3-5.  Lead counsel William Hibsher has represented CNS in a variety of First Amendment-related matters since 2015, including acting as lead counsel in several federal lawsuits in which CNS asserted its First Amendment right to contemporaneous access to newly-filed civil complaints in other states' courts.  Hibsher Decl., ¶¶ 9-15.  *See also* Tata Decl., ¶ 36 ("The BCLP firm has litigated these cases for years, and their experience and expertise was demonstrated here.").

With so much at stake, it would have been unreasonable for CNS to trust this case to any other law firm.  As Mr. Tata states in his declaration:

---

[12]  The CNS team at BCLP is comprised of many lawyers in various offices, led by CNS' outside general counsel and BCLP partner Rachel Matteo-Boehm in BCLP's San Francisco, California office.  Hibsher Decl., ¶ 122.

> I further am of the opinion that the time and labor for which CNS is claiming reimbursement is reasonable in light of the very nature of the controversy which relates to the essence of CNS' business – making civil complaints available to interested stakeholders in a contemporaneous manner.  If CNS cannot exercise its First Amendment right to obtain newly-filed civil complaints without delay, its business suffers substantial harm, other media suffers substantial harm, and the public suffers substantial harm.  And, the failure of public officials to respect the First Amendment may serve to undermine public confidence in key institutions.

Tata Decl., ¶ 31.

### B.    The Hours Expended Are Reasonable (Factors 1, 2, and 3)

Courts in the Eastern District of Virginia have given "liberal deference to [counsel's] judgment on the amount of time they felt necessary to properly prepare and pursue the case." *Va. Acad. of Clinical Psychologists v. Blue Shield of Va.*, 543 F. Supp. 126, 135 (E.D. Va. 1982) (internal quotation and citation omitted).  While the hours spent by CNS' attorneys on this matter were substantial, they were reasonable for a case involving the First Amendment right of access that lasted approximately 18 months, and included two motions to dismiss, extensive discovery, sizable cross-motions for summary judgment, as well as trial continuances that meant multiple trial preparation periods.  *See supra* at pp. 5-10 (Procedural Background).  *See also* Hibsher Decl., ¶¶ 37-108.  Trial was initially scheduled to begin on June 18, 2019, but was rescheduled by the Court for October 29, 2019.  Due to an ongoing civil jury trial at the end of October, trial was rescheduled for January 28, 2020.  Due to an ongoing criminal jury trial, trial was postponed by several days and began on January 31, 2020.  *See* Hibsher Decl., ¶¶ 50-51, 54, 58-59.  While the additional time may have added to the fees incurred, it also contributed to CNS' ability to efficiently try the case, as noted by the Court.  *See* Trial Tr. Vol. 4, 44:20-22.  It is also noteworthy that this fee application reflects a voluntary reduction in substantial hours billed and paid.  *See infra* at pp. 22-24 (Argument Section B.2); Hibsher Decl., ¶¶ 122-134; Tata Decl., ¶¶ 26, 42.

The lodestar hours being sought through this application reflect, in part, the vigor with which Defendants contested each factual and legal point – despite a lack of evidence to support their arguments – and the vigor with which CNS had to counter those tactics.

1. *Defendants' Actions Made this Case More Costly Than it Needed to Be*

The number of hours spent on this case, and thus the fees incurred, were dictated by Defendants' apparent failure to inquire regarding data showing processing times, their failure to review the data eventually produced by OES in good faith, their refusal to admit that they were delaying access to newly-filed civil complaints, and by their litigation tactics.  In response to a comment regarding their aggressive litigation strategy, Defendants' counsel stated:

> I think a comment was made we've aggressively litigated this case. I don't apologize for defending my client. So I wear that as badge of honor. And I think my clients deserve that.

Closing Arguments, Trial Tr. Vol. 4, 559:12-15.  But, the Fourth Circuit has a view on such a defense:

> A defendant is indeed entitled to use any litigation strategy that it desires and pursue an aggressive defense to achieve its goal; however, the defendant cannot complain, and should not be surprised, when such a strategy increases the fees and expenses for which it may be held liable as a non prevailing party.

*McKnight v. Circuit City Stores, Inc.*, 14 F. App'x 147, 153 (4th Cir. 2001).  *See also McNeil v. Faneuil, Inc.*, Case No. 5:15cv81, 2018 WL 1411017 (E.D. Va. Mar. 21, 2018) (Morgan, J.) ("the Court notes that one of the primary reasons Plaintiffs' attorneys' fees are so high is that Defendant fought—and forced Plaintiffs to fight—every issue in this case.  Defendant cannot fight the case to its last breath, and then complain that the attorney's fees are disproportionate to the amount recovered.").

Defendants first filed a motion to dismiss based on lack of venue and failure to name a necessary and indispensable party.  CNS had to research and brief the issues for its Opposition.

Hibsher Decl., ¶ 42. While Defendants' motion to dismiss was pending, the parties engaged in extensive discovery, including serving and responding to requests for the production of documents, interrogatories, requests for admission, and the taking and defending of depositions. *Id.* ¶¶ 64-108. Then, five months later, after extensive discovery had already occurred, Defendants filed another motion to dismiss, this time based on abstention grounds. This motion was untimely and lacked merit, yet CNS had to research and brief the issue for its Opposition. *Id.* ¶ 44.

CNS also had to engage in third-party discovery to uncover the OES data related to the date of scanning. *Id.* ¶¶ 87-94. Despite being repeatedly asked for the scan date data, Defendants claimed that it did not exist. *Id.* ¶¶ 73, 75-76, 78, 94. It took a third-party subpoena to OES and a deposition of OES to receive confirmation that the scan date data did exist. *Id.* ¶¶ 88-92. It then took another month for the data to be produced to CNS – arriving six months after this case was filed and after substantial discovery and motion practice had occurred. *Id.* ¶ 93.[13] At no time after the scan dates were provided by OES – which established the existence of delays – did Defendants reach out in an effort to resolve this dispute. Instead, they repeatedly asserted that the OES scan date data was an unreliable measure of when the complaints were first made available to the public due to rescanning. "However, evidence at trial showed that re-scanning usually happens immediately after an error is discovered on the filing date," Opinion at 15, ¶ 55(f), and that it rarely happens. Brenda Elford, the Civil Division Supervisor at the Prince William Circuit Court testified (via deposition read in at trial) that "very little" of civil complaints are rescanned. Elford Testimony, Trial Tr. Vol. 2, 316:11-13. And, Tom Larson, the

---

[13]   There is no question that CNS was entitled to receive the scan date data when it was first requested – regardless of what Defendants or OES thought it might represent. Hibsher Decl., ¶¶ 70-94.

Chief Deputy Clerk for the Norfolk Circuit Court, testified that a complaint had not been rescanned in three to four years.  Testimony of Thomas Larson, Trial Tr. Vol. 1, 120:15-25.  Mr. Larson's testimony resulted in this admonition to Defendants' counsel from the Court:

> Let's get rid of rescanning. Unless you've got evidence to the contrary, it doesn't appear to me that rescanning has anything to do with the case. Unless you've got evidence contrary to what Mr. Larson said. This is an exercise in futility. Or obfuscation, whatever you want to call it.

Trial Tr. Vol. 2, 242:13-18.

CNS engaged an expert to review and analyze the OES data, requiring counsel to work with Ms. Kancherla to facilitate the drafting of her initial expert report and rebuttal expert report, and to prepare her to give testimony at trial.  *See supra* at pp. 8-9 (Retention of an Expert); Hibsher Decl., ¶¶ 109-20.

Finally, it bears noting that this is the first case that CNS has brought that has gone to a full courtroom trial.  And, it went to trial because of the choices Defendants made, choices that required CNS to spend more than 18 months to obtain the declaratory relief that could have been agreed to earlier on in the case, as other state courts have done.  *See, e.g., Courthouse News Serv. v. Jackson*, CA No. H-09-1844, 2009 WL 2163609, at *3-4 (S.D. Tex. July 20, 2009).[14]  Once filed, a lawyer has an ethical duty to advocate vigorously for his or her client and must respond to the positions taken by the opponent in order to prevail.  When the opponent significantly increases the costs to litigate, the client necessarily must consider whether it is throwing good money after bad.  What should have been a relatively straightforward lawsuit became a lengthy ordeal in which the clerks contested everything.  *See MTU Am. Inc. v. Swiftships Shipbuilders LLC*, Case No. 14-cv-773, 2015 WL 4139176, at *5 (E.D. Va. July 8, 2015) (finding that

---

[14]  Following the court's granting of the preliminary injunction, CNS and the clerk stipulated to a permanent injunction.

"defendants' litigation strategy … forced plaintiff to incur significant attorney's fees and expenses."); *see also* Jan. 16 Tr., 46:15-20 ("the Court's view of it would be throwing good money after bad to avoid this resolution because you're worried about the amount of attorney's fees. Because if you end up paying attorney's fees, they're going to be more the longer this case goes on and the more hearings the Court has.").[15]

2. <u>*CNS Seeks Reimbursement for Less Time Than was Actually Spent*</u>

In addition to cutting the timekeepers' usual billing rates by approximately 10% and freezing those rates at 2018 levels, *see* Hibsher Decl., ¶ 133; Matteo-Boehm Decl., ¶¶ 6-7, CNS has also voluntarily excluded more than one-third of the time billed and paid from the lodestar calculation:

a. <u>Time Billed By Attorneys Other than the Trial Team</u>. The CNS team at BCLP is comprised of many lawyers in various offices and is led by Ms. Matteo-Boehm. Hibsher Decl., ¶ 122. While a number of lawyers, paralegals, e-discovery database managers, and other professionals performed work on this matter, CNS is only seeking fees for time billed by those professionals present for trial – Mr. Hibsher, Ms. Goldman, Mr. Harrison, Mr. Shumadine, Ms. Weiss, Ms. Martinez, and Ms. Yoder. *Id.* ¶¶ 123-24, 129. This is despite the fact that significant amounts of time related to all aspects of the litigation – written discovery, document review and production, legal research, and assistance with drafting and editing briefs – were billed by attorneys and fee earners other than the trial team. *Id.*

---

[15] "[T]he fact that taxpayers would be required ultimately to pay the fees [is] an improper ground for denying or reducing an attorney's fee to the prevailing party under 42 U.S.C. § 1988." *Rum Creek Coal Sales, Inc.*, 31 F.3d at 180.

b.    <u>Time Billed Prior to April 1, 2018</u>.  While BCLP's work on this litigation began in 2017, CNS is only seeking attorneys' fees for time billed by the trial team after April 1, 2018.  *Id.* ¶¶ 123, 126.

c.    <u>Time Billed in Connection with CNS' Motion for Preliminary Injunction</u>.  Soon after filing the complaint in this matter, CNS filed a Motion for Preliminary Injunction.  After Defendants made factual contentions denying the existence of any delays and vowing to provide "compelling evidence" that no such delays existed, CNS withdrew the Preliminary Injunction Motion.  While the Motion for Preliminary Injunction was based on the same set of facts as the claim on which CNS ultimately prevailed and is thus "related" and arguably compensable as part of the fee award, *Hensley*, 461 U.S. at 434, CNS made a good faith decision to exclude time spent on this motion from its lodestar hours.  Hibsher Decl., ¶ 127.

d.    <u>Time Billed by Two or More Timekeepers</u>.  CNS has also, in many instances, excluded time entries where two or more timekeepers concurrently performed similar tasks or where two or more timekeepers billed for the same event.  *Id.* ¶ 128.[16]  For example, while Mr. Hibsher, in his role as lead counsel, attended a number of the depositions taken in this matter, CNS has excluded his time for those party depositions that he did not personally take.  *Id.*

e.    <u>Discretionary Exclusions</u>.  In addition, CNS has removed time entries associated with tasks related to ancillary issues that did not form the basis of the claims or defenses in this action, such as investigating access to the Officers of the Court Remote Access ("OCRA") system and the agreed-upon revising of summary judgment briefs after filing due to spacing errors.  *See id.* ¶ 130.

---

[16]  If two attorneys were present at a court conference or court hearing, CNS is seeking fees for the participation of both attorneys at that conference or hearing.  In addition, if more than one attorney was necessary for the task, CNS is seeking those fees.  Hibsher Decl., ¶ 128.

Noting the reductions made in this fee application, Mr. Tata states: "CNS' self-restraint in voluntarily reducing its rates for all timekeepers for which it is seeking recovery, and not making claims at all for numerous other timekeepers (fees which were billed and paid) is remarkable and unique in my experience," Tata Decl., ¶ 26, and is, itself, an indication of reasonableness. *Id.* ¶ 42.

**C.     The Results Obtained Justify a Full Fee Award (Factor 8)**

In determining the reasonableness of a fee award, "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436. CNS sued to enforce a fundamental right of the press and the public to learn about newly-filed civil litigation, and the declaratory relief afforded to CNS represents a decisive victory not only for CNS, but for other media and the public at large. Hibsher Decl., ¶ 63; Tata Decl., ¶¶ 31, 38.

CNS has become the "eyes and ears" for much of the media, Trial Tr. Vol. 1, at 47:25, and acts as a "surrogate[ ] for the public." *Courthouse News Service v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014). "News organizations play[ ] a major role in protecting the press and speech freedoms enshrined by the First Amendment to the U.S. Constitution," Knight Foundation, *In Defense of the First Amendment* (April 21, 2016), https://knightfoundation.org/wp-content/uploads/2016/04/KF-editors-survey-final_1.pdf, and CNS has been doing its part to protect the First Amendment. But litigation is "extraordinarily expensive" and this litigation "blast[ed] a hole in [CNS'] bottom line." Trial Tr. Vol. 1, at 98:23-24. *See* Knight Foundation, *In Defense of the First Amendment* (Apr. 21, 2016) ("economic pressures on traditional news companies" have left them "less able to fulfill [their] historic role as First Amendment champions."); *see also, e.g.*, RonNell Andersen Jones, *Litigation, Legislation, & Democracy in a Post-Newspaper America*, 68 Wash. & Lee L. Rev. 557, 562 (Spring 2011) ("death of

newspapers can be expected to bring about a perilous lapse in legal efforts to demand government ... accessibility"). The importance of the Court's decision to the press and the public is further demonstrated by the fact that it has received extensive publicity in the media. *See Judge Says State Courts Must Offer Timely Access to New Filings*, Associated Press (Feb. 23, 2020), https://apnews.com/163fad0b6f4f9c72b54c75fb2948922c (republished by The Washington Post, WTKR3, The Miami Herald, and U.S. News and World Report).

CNS brought this action to challenge the Defendants' admitted policies, customs, and practices of withholding access to newly-filed civil complaints until after full administrative processing – intake, indexing, and scanning. In bringing this lawsuit, CNS' goal was to remedy access issues at the Norfolk and Prince William Circuit Courts. With the ruling announced by the Court from the bench on February 5 and in its February 20 Opinion and Order, CNS achieved its goal, and it should be compensated for the time it took to do it.

While the Court did not grant the alternatively requested injunctive relief at this time, that does not diminish CNS' success. The Court has retained jurisdiction so that CNS may renew its motion for a preliminary injunction – should it become apparent that one is necessary due to continued delays – because "the Court is persuaded that [CNS] has made a showing that there is a real risk that Defendants, in the absence of an injunction, could revert to their pre-lawsuit practices and customs." Opinion at 43. Moreover, the injunction sought by CNS stemmed from "a common core of facts" and was "based on related legal theories" to the requested declaratory relief, meaning that "[m]uch of counsel's time [was] devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim by claim basis." *McNeil v. Faneuil, Inc.*, Case No. 15-cv-81, 2017 WL 9771834, at *10 (E.D. Va. Nov. 8, 2017) (quoting *Hensley*, 461 U.S. at 435 and further stating that "[t]he Supreme Court has ... instructed the

district court to 'focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'"), *report and recommendation adopted by*, 2018 WL 411017 (E.D. Va. Mar. 21, 2018) (Morgan, J.).

### III.   CNS Should Recover its Non-Taxable Expenses in Full[17]

CNS should also recover non-taxable litigation expenses in the amount of $232,559.83. Hibsher Decl., ¶ 141 and Ex. G; Matteo-Boehm Decl., ¶ 13; *Coward v. Robinson*, Case No. 10-cv-147, 2017 WL 5195868, at *7 (E.D. Va. Nov. 9, 2017) ("The Fourth Circuit has held that a plaintiff entitled to attorneys' fees is also entitled to recover reasonable litigation expenses.") (quoting *Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986)).  All of the costs that were incurred through December 31, 2019 have been paid by CNS.  Matteo-Boehm Decl., ¶ 13.[18]

Included as part of these non-taxable expenses is $194,333.58 in expert witness fees, *see* Hibsher Decl., ¶ 120 and Ex. D, which are recognized as part of an award of attorneys' fees under 42 U.S.C. § 1988(c).  *See Coward*, 2017 WL 5195868, at *7.  As discussed above, in running her analysis and calculations and preparing her opinion – which the Court said was "entitled to significant weight," Opinion at 17, ¶ 62, Ms. Kancherla interviewed the CNS reporters, traveled to the Norfolk and Prince William Circuit Courts to review complaints on the public access terminals, reviewed all deposition transcripts and relevant documents, and reviewed the OES data and compared it with CNS' tracking data.  *See* Hibsher Decl., ¶¶ 115, 120 and Ex. D (documentation for requested expert fees).

---

[17]  CNS has also separately filed an application for taxable costs.

[18]  *See* n.11, *supra*, for information regarding CNS' payment of invoices for January and February 2020.

### IV.    <u>CNS is Entitled to its Fees for Preparing this Fee Application</u>

In addition to recovery for work on the merits, it is also "well-settled that reasonable time and expenses spent preparing a fee petition are compensable." *Am. Canoe Ass'n v. EPA*, 138 F. Supp. 2d 722, 746 (E.D. Va. 2001). CNS is seeking approval for $135,747.50 in fees related to the prosecution of this fee application, which represents fees for 219.9 hours billed by BCLP, Willcox & Savage and Hunton Andrews Kurth.[19]

### V.    <u>CNS is Entitled to Reasonable Fees and Expenses for Necessary Future Services</u>

Given the Court's directive that "[t]he parties should monitor the levels of access provided by Defendants" and "file a joint status report on the level of access provided by Defendants with supporting documents from OES," Opinion at 43, CNS hereby reserves the right to seek reasonable attorneys' fees and costs for the future attorneys' services that will be required in this case. *See Airlines Reporting Corp. v. Sarrion Travel, Inc.*, 846 F. Supp. 2d 533, 537 (E.D. Va. 2012) ("If future services of an attorney will be required in connection with a case, the fact finder should make a reasonable estimate of their value. In so doing, the fact finder should estimate the time to be consumed, the effort to be expended, the nature of the services to be rendered, and any other relevant circumstances.").

<u>CONCLUSION</u>

The Court has held that the press and public enjoy a qualified right of access to newly-filed civil complaints contemporaneous with the filing of the complaint, that contemporaneous means "the same day on which the complaint is filed, insofar as is practicable," and that "a reasonable expectation is that 85-90% of the new civil filings will be accessible to the public and

---

[19]   This represents only a portion of the fees expended to prepare this fee application, and excludes time spent reviewing the invoices and determining the exclusions referenced above. *See supra* at pp. 22-24 (Argument Section B.2).

press on the date of filing." Opinion at 41. Given such a holding, CNS has won a victory not only for itself but for its subscribers, other non-subscribing news organizations, and for the public as well.

WHEREFORE, CNS respectfully requests that this Honorable Court grant its Application for Attorneys' Fees and Costs in full and grant such further relief as it deems equitable, just, and proper.

Dated: March 4, 2020                                   Respectfully submitted,


                                                       /s/ _____
                                                       Conrad M. Shumadine
                                                       VSB No. 4325
                                                       *Counsel for Plaintiff*
                                                       **WILLCOX & SAVAGE, P.C.**
                                                       440 Monticello Avenue, Suite 2200
                                                       Norfolk, VA 23510
                                                       Telephone: (757) 628-5500
                                                       Fax: (757) 628-5566
                                                       cshumadine@wilsav.com

                                                       William Hibsher (*Admitted Pro Hac Vice*)
                                                       *Counsel for Plaintiff*
                                                       **BRYAN CAVE LEIGHTON PAISNER LLP**
                                                       1290 Avenue of the Americas
                                                       New York, NY 10104
                                                       Telephone: (212) 541-2000
                                                       Fax: (212) 541-4630
                                                       wjhibsher@bclplaw.com

                                                       Heather S. Goldman (*Admitted Pro Hac Vice*)
                                                       Bryan J. Harrison (*Admitted Pro Hac Vice*)
                                                       *Counsel for Plaintiff*
                                                       **BRYAN CAVE LEIGHTON PAISNER LLP**
                                                       1155 F Street, NW, Suite 700
                                                       Washington, DC 20004
                                                       Telephone: (202) 508-6000
                                                       Fax: (202) 508-6200
                                                       heather.goldman@bclplaw.com
                                                       bryan.harrison@bclplaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of March, 2020, I electronically filed the foregoing with the Clerk of Court using CM/ECF system, which will send a notification of such filing to all counsel of record as listed below:

William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Michael G. Matheson (VSB No. 82391)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Tel: (804) 649-7545
Fax: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
mmatheson@t-mlaw.com

*Counsel for Defendants*

/s/
Conrad M. Shumadine
VSB No. 4325
*Counsel for Plaintiff*
**WILLCOX & SAVAGE, P.C.**
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com

William Hibsher (*Admitted Pro Hac Vice*)
*Counsel for Plaintiff*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Fax: (212) 541-4630
wjhibsher@bclplaw.com

Heather S. Goldman (*Admitted Pro Hac Vice*)
Bryan J. Harrison (*Admitted Pro Hac Vice*)
*Counsel for Plaintiff*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
heather.goldman@bclplaw.com
bryan.harrison@bclplaw.com