**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | | |
|---|---|---|
| COURTHOUSE NEWS SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-391-HCM |
| | ) | |
| GEORGE E. SCHAEFER, in his official | ) | |
| capacity as Clerk of the Circuit Court for | ) | |
| Norfolk, Virginia, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF WILLIAM J. HIBSHER IN SUPPORT OF
COURTHOUSE NEWS SERVICE'S APPLICATION FOR ATTORNEYS' FEES**

I, William J. Hibsher, declare and state as follows:

1.      I am an attorney duly licensed to practice law in the State of New York and am a Senior Counsel with the law firm of Bryan Cave Leighton Paisner LLP ("BCLP"), attorneys for Plaintiff Courthouse News Service ("CNS") in the above-captioned action before this Court ("*Schaefer* Matter").  As the lead lawyer for CNS in this action, I oversaw all aspects of this case during its pendency.

2.      I make this declaration of my own personal knowledge, including my knowledge of BCLP's files relating to this action, in support of CNS' application for an award of attorneys' fees pursuant to 42 U.S.C. § 1988, and could testify to the facts set forth herein if called as a witness.

3.      Rather than acknowledge the existence of delays during the period at issue in the complaint, which were established at trial, Defendants (as herein defined) and their attorneys steadfastly denied any delays and elected to aggressively defend this case.  In fact, at trial, Defendants' counsel noted that he was wearing a "badge of honor" for "aggressively litigat[ing]

1

this case."  Transcript of Proceedings, February 5, 2020 ("Trial Tr. Vol. 4"), ECF No. 93, at 559:12-15.

4.      Defendants filed not one, but two motions to dismiss (five months apart), both of which were denied, and litigated this case through full discovery, including numerous depositions, written discovery and document productions, cross-motions for summary judgment, and trial – all based on Defendants' unsupported assertion that there were no delays in access to newly-filed civil complaints in their courts.   Despite Defendants' repeated claims that "compelling evidence" existed to refute CNS' delay allegations, Defendants failed to produce any such "compelling evidence."  CNS needed to subpoena and depose a third-party, the Office of Executive Secretary of the Supreme Court of Virginia ("OES"), who ultimately produced (after three months' delay) "compelling evidence" that contradicted Defendants' assertions.

5.      Rather than accept the clear proof of delays set forth in the data produced by OES in January 2019 ("OES Data"), six months after CNS filed this action, and seek to resolve the case at that time, Defendants attacked the OES Data that indicated when cases were made public on the ground that the electronically recorded scan date, which marks the moment cases become public (and therefore provides an end-point for delay calculations), was unreliable because of a wholly unsupported allegation regarding rescanning, which this Court concluded was a "red herring."  Trial Tr. Vol. 4, at 592:1; *see also* February 20, 2020 Opinion and Order ("Opinion"), ECF No. 102, at 15, ¶ 55(f) (noting that Defendants' own testimony was uniform that rescanning rarely occurred).

## INFORMATION REGARDING CNS' TRIAL TEAM

**Lead Trial Counsel Role and Responsibilities**

*William J. Hibsher*

6.      I have been a Senior Counsel in the New York office of BCLP since 2014.  From 2004 to 2014, I was a partner in the New York office of BCLP and its predecessor firm, Bryan Cave LLP (which I will also refer to herein as BCLP for ease of reference).  I graduated *cum laude* from St. John's University School of Law in 1974 and was admitted to the Bar of the State of New York in 1975 and to practice before the U.S. District Courts for the Southern and Eastern Districts of New York and the U.S. Court of Appeals for the Second Circuit that same year. Upon graduation from law school, I was a litigation associate with the New York law firm now known as Kramer Levin Naftalis & Frankel LLP.

7.      In 1977, I became an Assistant United States Attorney for the Southern District of New York, and in 1980, I was named Chief of the Civil Rights Unit of that Office.  In 1982, I returned to private practice as an associate at Teitelbaum & Hiller, a small New York firm specializing in civil rights litigation, and became a partner of that firm in 1983.  In 1996, Teitelbaum & Hiller (then known as Teitelbaum, Hiller, Rodman, Paden & Hibsher) dissolved, and I joined Robinson Silverman Pearce Aronson & Berman.  That firm merged with Bryan Cave LLP in 2004.  A copy of my law firm webpage biography is attached hereto as **Exhibit A**.

8.      For over forty years, I have practiced civil litigation, and regularly take on cases involving constitutional issues, either on behalf of a party or an amicus, and estimate no fewer than 25 such matters over the years.  I have also served on the boards of directors of numerous civil rights and social justice organizations and was a member of New York City's Human

Rights Commission for five years.  I am the recipient of lifetime achievement awards from Lambda Legal, the LGBT Bar Association of New York, and Family Equality Council.

9.      In 2015, I joined the team of lawyers at BCLP who had been representing CNS in a variety of First Amendment matters, including several federal lawsuits in which CNS asserted its right to timely access to newly-filed civil complaints in state courts pursuant to the First Amendment.  Attorneys now associated with BCLP have represented CNS, a nationwide news service that focuses its reports on civil litigation, since at least as early as 2002.  BCLP has represented CNS since 2012.

10.      In 2016, I served as lead counsel in *Courthouse News Service v. Tingling*, Case No. 1:16-cv-08742-ER (S.D.N.Y. Nov. 10, 2016).  In *Tingling*, CNS obtained a preliminary injunction requiring the Clerk of the Supreme Court, New York County to provide timely access to newly-filed civil complaints and precluding administrative processing of those complaints prior to access.  The complaint alleged that while CNS did have access to 66% of newly-filed complaints on the day of filing, one-third of new civil filings were delayed by at least one day. Following the issuance of the preliminary injunction in CNS' favor, the parties entered into a consent judgment and compromised CNS' claim for an attorneys' fee award of $500,000 (the amount of fees CNS asserted) for a settled agreed payment of $335,000 in fees.

11.      In 2017, I served as lead counsel in *Courthouse News Service v. Idoni*, Case No. 7:17-cv-04214-NSR (S.D.N.Y. June 5, 2017), which sought timely access to newly-filed civil complaints against the Clerk of the Supreme Court, Westchester County.  Defendant entered into a consent judgment within days of the commencement of the action, and attorneys' fees were not sought.

12.     Following the *Tingling* and *Idoni* cases, the clerks of 46 other New York Counties voluntarily agreed to provide CNS with the same access to newly-filed civil complaints as the *Tingling* and *Idoni* defendants.  To date, access in these New York courts has been timely, and CNS has not sought any post injunction relief from the courts.

13.     In 2016, I served as lead counsel in *CNS v. Gabel, et. al*, Case No. 2:17-cv-00043-D. Vt. Mar. 17, 2017), a facial challenge to a Vermont Rule of Civil Procedure that provided that all newly-filed civil complaints would be maintained by the clerks of the courts of Vermont in a confidential manner until all defendants named in newly filed litigations were served with a copy of the complaint.  Following the filing of the complaint in *Gabel*, I provided a draft of a motion for a preliminary injunction that I intended to file on CNS' behalf to the Vermont Attorney General's office, and within 30 days, the Vermont Supreme Court rescinded the rule at issue in the case, and the case was dismissed.  No attorneys' fees were requested.

14.     In addition to the several lawsuits on CNS' behalf, I have represented CNS regarding issues involving access to newly-filed civil complaints in Maine, Massachusetts, and New Jersey, and have generally been involved in analysis of access issues in a number of other states as well.

15.     In the course of these several litigations and other access matters on behalf of CNS, I believe that I and the other lawyers on the CNS trial team (as identified below) have developed the knowledge and familiarity with the client and the relevant law to make us experienced in the issues that were anticipated in the *Schaefer* Matter.

16.     Other lawsuits brought by BCLP asserting First Amendment rights on behalf of CNS include:

- *Courthouse News Service v. Jackson, et al.*, Case No. 4:09-cv-01844 (S.D. Tex. June 12, 2009) – In July 2009, the district court granted CNS' motion for preliminary injunction and, in December 2009, denied defendants' motion to dismiss.   This case was ultimately resolved through a stipulated permanent injunction entered in March 2010.   Pursuant to the stipulated injunction, the defendant clerk paid more than $250,000 in fees; the fees CNS incurred were slightly above that amount;

- *Courthouse News Service v. Planet*, Case No. 2:11-cv-08083-SJO-FFM (C.D. Cal. Sept. 29, 2011) – In *Planet*, after two appeals – *first appeal* 750 F.3d 776 (9th Cir. 2014) (reversed district court's dismissal on abstention grounds and remanded), *second appeal* 614 Fed. Appx. 912 (9th Cir. 2015) (unpublished) (reversed district court's dismissal for failure to state a claim and remanded) – the district court granted CNS' motion for summary judgment in part and entered judgment in CNS' favor.   CNS sought total fees of approximately $5,160,000 and costs of roughly $57,000.   The district court ultimately awarded CNS $2,062,752 in fees and $52,893.98 in costs.   The fee decision was the subject of a cross-appeal and was not directly addressed in the Ninth Circuit's recent decision in the third *Planet* appeal, 947 F.3d 581 (9th Cir. Jan. 17, 2020), except to vacate the fee award and remand to the district court for further proceedings.

17.     I have overseen all aspects of this case from its inception through trial and this application for attorneys' fees.  As lead attorney, I was responsible for communicating with the client at all junctions, including regular communication regarding case developments, strategic decisions, court filings, and staffing.  Having been involved in this matter since its inception, it was necessary and critical that I review most documents and filings to ensure accuracy, consistency, quality, and conformity with applicable rules and procedures.  I participated in or oversaw the drafting and preparation of all pleadings, motion papers, discovery requests, disclosures, and other written briefs or submissions to the court and opposing counsel.  I also participated in and oversaw the preparation of witnesses for depositions and trial testimony, our expert witness for her expert report and rebuttal report and trial testimony, and trial preparation.

18.     My standard hourly billing rates during the 2018-2020 period were: $815 (2018), $850 (2019), and $885 (2020).  My hourly rate charged to CNS for this case during all periods was/is $734.  For the purposes of this attorneys' fee application, my hourly rate is $730.

19.     For purposes of this attorneys' fee application, CNS is claiming 883.3 hours worked by me, of which 146.6 hours were from April 1, 2018 to December 31, 2018; 551.1 hours were from January 1, 2019 to December 31, 2019; 170.8 hours were from January 1, 2020 through February 5, 2020 (the conclusion of trial); and 14.8 hours were from February 6, 2020 to February 28, 2020 (representing time for the preparation of CNS' fee application).

**Remaining Trial Team Attorneys/Professional's Biographies and Rates**

*Heather S. Goldman*

20.     Since January 1, 2020, Heather S. Goldman has been a partner in the Washington, D.C. office of BCLP.  Prior to January 1, 2020, Ms. Goldman was an associate in BCLP's New York office (from April 2008 – July 2010) and Washington, D.C. (from July 2010 – December

31, 2019). Ms. Goldman graduated from Georgetown University Law Center in 2008. Ms. Goldman was admitted to practice in New York in 2008, New Jersey in 2008, and the District of Columbia in 2011. She regularly assists clients resolving commercial disputes and responding to government investigations and inquiries. Ms. Goldman has represented clients in connection with matters involving the First Amendment and other media law issues, the Americans with Disabilities Act and website accessibility, intellectual property disputes, and false advertising. A copy of Ms. Goldman's law firm webpage biography is attached hereto as **Exhibit B**.

21.     Prior to joining BCLP as an associate, Ms. Goldman was an award-winning producer at CNN for seven years, covering legal news on *Burden of Proof* from 1999 to 2001 and then political and general news on *Late Edition with Wolf Blitzer* from 2001 to 2007. While at CNN, Ms. Goldman received an Emmy for her contribution to the coverage of the September 11th terror attacks, a duPont Award for her contribution to the coverage of the Tsunami disaster in South Asia, and a Peabody Award for her contribution to the coverage of Hurricane Katrina and its aftermath.

22.     Ms. Goldman has assisted CNS in a variety of matters since 2014, including as part of the *Tingling* case team.

23.     Ms. Goldman's standard hourly billing rates during the 2018-2020 period were: $660 (2018), $695 (2019), and $745 (2020). Ms. Goldman's hourly rate charged to CNS for this case during all periods was/is $594. For purposes of this attorneys' fee application, Ms. Goldman's hourly rate is $590.

24.     For purposes of this application, CNS is claiming 1,204 hours worked by Ms. Goldman, of which 312.8 hours were from April 1, 2018 to December 31, 2018; 654.7 hours were from January 1, 2019 to December 31, 2019; 172.6 hours were from January 1, 2020

through February 5, 2020 (the conclusion of trial); and 63.9 hours were from February 6, 2020 to February 28, 2020 (representing time for the preparation of CNS' fee application).

### *Bryan J. Harrison*

25.     Bryan J. Harrison has been an associate in the Washington, D.C. office of BCLP since 2016.  Mr. Harrison graduated *magna cum laude* from the University of Miami School of Law in 2010, where he was Order of the Coif.  Mr. Harrison was admitted to practice law in Maryland in 2010, the District of Columbia in 2013, and Florida in 2013.  Following law school, Mr. Harrison served as a law clerk to the Honorable William T. Moore, Jr., District Judge, United States District Court for the Southern District of Georgia, from 2011 to 2013.  From 2014 to 2016, Mr. Harrison was a litigation associate at the law firm of Ballard Spahr LLP.  Mr. Harrison represents clients in federal civil litigation and antitrust matters, including affirmative and defensive cases under the First Amendment, Administrative Procedures Act, and the Freedom of Information Act.  A copy of Mr. Harrison's law firm webpage biography is attached hereto as **Exhibit C**.

26.     Mr. Harrison has assisted CNS in access matters since 2016, including communicating with clerk's and other court staff throughout Maryland.

27.     Mr. Harrison's standard hourly billing rates during the 2018-2020 period were: $605 (2018), $655 (2019), and $705 (2020).  Mr. Harrison's hourly rate charged to CNS for this case during all periods was/is $545.  For purposes of this attorneys' fee application, Mr. Harrison's hourly rate is $545.

28.     For purposes of this application, CNS is claiming 752.6 hours worked by Mr. Harrison, of which 226.2 hours were from April 1, 2018 to December 31, 2018; 405.1 hours were from January 1, 2019 to December 31, 2019; 83.6 hours were from January 1, 2020 through

February 5, 2020 (the conclusion of trial); and 37.7 hours were from February 6, 2020 to February 28, 2020 (representing time for the preparation of CNS' fee application).

### *Eileen M. Weiss*

29.     Eileen M. Weiss has been a paralegal in the Washington, D.C. office of BCLP since 1996.

30.     Ms. Weiss' standard hourly billing rates during the 2018-2020 period were: $345 (2018), $360 (2019), and $375 (2020).  Ms. Weiss' hourly rate charged to CNS for this case during all periods was/is $310.  For purposes of this attorneys' fee application, Ms. Weiss' hourly rate is $290.

31.     For purposes of this application, CNS is claiming 198.3 hours worked by Ms. Weiss, of which 46.9 hours were from April 1, 2018 to December 31, 2018; 82.1 hours were from January 1, 2019 to December 31, 2019; 56.3 hours were from January 1, 2020 through February 5, 2020 (the conclusion of trial); and 13.0 hours were from February 6, 2020 to February 28, 2020 (representing time for the preparation of CNS' fee application).

### **Local Counsel & Local Counsel Professionals' Biographies and Rates**

### *Conrad M. Shumadine*

32.     For all relevant periods at issue for this fee application, Conrad M. Shumadine served as local counsel in the *Schaefer* Matter.  Mr. Shumadine is a partner in the Norfolk, Virginia office of Willcox & Savage, P.C.  Mr. Shumadine was admitted to practice law in the Commonwealth of Virginia in 1967.  Mr. Shumadine's extensive credentials during his fifty-plus years of practice are set forth in detail in his accompanying declaration and exhibits.

33.     The hourly rate Mr. Shumadine charged to CNS for this case during all periods was/is $450.  For purposes of this attorneys' fee application, his hourly rate is $450.

34.     For purposes of this attorneys' fee application, CNS is claiming 262.7 hours worked by Mr. Shumadine, of which 97.8 hours were from April 1, 2018 to December 31, 2018; 86.2 hours were from January 1, 2019 to December 31, 2019; 59.3 hours were from January 1, 2020 through February 5, 2020 (the conclusion of trial); and 19.4 hours were from February 6, 2020 to February 28, 2020 (representing time for the preparation of CNS' fee application).

*Patricia A. Yoder*

35.     For all relevant periods at issue for this fee application, Patricia A. Yoder, a litigation paralegal in the Norfolk, Virginia office of Willcox & Savage, P.C., assisted in this matter.  Ms. Yoder's experience and billing rates are detailed in the accompanying declaration and exhibits of Mr. Shumadine.

*Nilsa I. Martinez*

36.     For all relevant periods at issue for this fee application, Nilsa I. Martinez, a litigation support analyst in the Norfolk, Virginia office of Willcox & Savage, P.C., assisted in this matter.  Ms. Martinez's experience and billing rates are detailed in the accompanying declaration and exhibits of Mr. Shumadine.

## **LITIGATION TIMELINE**

37.     This case involves serious First Amendment issues of first impression in this Court and in the United States Court of Appeals for the Fourth Circuit.

38.     Following CNS' tracking of delays by the CNS reporters from January to June 2018 in the Norfolk Circuit Court and the Prince William Circuit Court, CNS filed its Complaint on July 19, 2018, seeking declaratory and injunctive relief against the clerks of both of the courts in their official capacities.  ECF No. 1.

**CNS' Motion for Preliminary Injunction and CNS' Subsequent Withdrawal of Motion for Preliminary Injunction**

39.     On July 20, 2018, CNS filed a Motion for Preliminary Injunction and Memorandum in Support with supporting declarations (ECF Nos. 4, 5), outlining CNS' claims regarding delays in access to newly-filed civil complaints in the Norfolk and Prince William Circuit Courts.

40.     On August 23, 2018, Defendants George E. Schaefer, clerk of the Norfolk Circuit Court ("Defendant Schaefer"), and Jacqueline C. Smith, clerk of the Prince William Circuit Court ("Defendant Smith," and, with Defendant Schaefer, the "Defendants") filed a Response in Opposition to CNS' Motion for Preliminary Injunction (ECF No. 20), arguing that a preliminary injunction was improper given "Defendants' compelling evidence that newly-filed complaints are ordinarily made accessible to the public on the same business day they are received for filing."  ECF No. 20 at 2.

41.     Given Defendants' factual contentions with respect to the delays at issue in CNS' Complaint and Motion for Preliminary Injunction, and in the interest of judicial economy, CNS withdrew its Motion for Preliminary Injunction so that CNS could discover from Defendants the "compelling evidence" they contended disproved CNS' delay allegations.  ECF No. 26.  As explained below, CNS does not seek attorneys' fees for the substantial work expended in preparing the preliminary injunction papers.

**Defendants' Filing of Multiple (and Ultimately Unsuccessful) Motions to Dismiss**

42.     Also in August 2018, Defendants filed a Motion to Dismiss and Memorandum in Support, ECF Nos. 21, 22, arguing that CNS' Complaint should be dismissed because, *inter alia:* a) CNS used "flawed and unsubstantiated data" and Defendants' "evidence will establish that these claims are baseless," b) OES was "a necessary and indispensable party;" and c) Defendant

Smith was misjoined to the lawsuit, making "venue in [the Norfolk Division] improper."  ECF No. 22, at 1-2.  CNS had to research and brief the issues and opposed Defendants' Motion to Dismiss.  ECF No. 27.  Defendants filed a Reply, again noting that "there is significant indicia that [the CNS delay statistics] are unreliable based on the misleading data that has been inserted into CNS's Complaint."  ECF No. 29, at 3.

43.     The Court held a Rule 16(b) Scheduling Conference on November 27, 2018 and, on November 28, 2018, entered a Scheduling Order setting a bench trial for June 18, 2019.  ECF No. 32.

44.     Over five months later, while Defendants' Motion to Dismiss was still pending and after extensive discovery had taken place, *see infra* at pp. 18-28 (Discovery & Third-Party Discovery), Defendants filed a Motion for Abstention and Memorandum in Support.  ECF Nos. 35, 36.  While this additional argument was untimely and without merit, CNS again had to research and brief the issues for its opposition.  ECF No. 43.  Defendants filed a Reply, claiming that CNS' opposition on untimeliness grounds and unavailability of abstention under prevailing law "are meritless."  ECF No. 45, at 2.

45.     On March 13, 2019, the Court held a hearing on Defendants' Motion to Dismiss and Motion for Abstention.  ECF No. 46.  The Court denied both of Defendants' motions at the hearing and issued a written Opinion & Order on March 18, 2019, largely adopting the arguments asserted by CNS in its oppositions.  ECF No. 48.

**The Parties' Cross-Motions for Summary Judgment**

46.     On April 26, 2019, the parties filed cross-motions for summary judgment on an agreed-upon briefing schedule.  ECF Nos. 53, 54 - Defendants; ECF Nos. 56, 57, 58, 59 - CNS.

47.     Defendants' summary judgment filing was voluminous and contained 3 declarations, and 20 additional exhibits, comprising over 1,100 pages.  *See* ECF Nos. 53, 54. Relying upon the OES Data (Joint Trial Exhibit 1a-e), Defendants' summary judgment brief claimed that the OES Spreadsheet data on the scan date was "unreliable to establish when a new complaint was initially scanned [and] thus, the OES metadata does not accurately provide a date that newly-filed civil complaints were first available[.]"  ECF No. 54, at 9.

48.     Because Defendants continued to deny the existence of any delays, CNS' summary judgment filing was voluminous and contained 8 declarations, and 37 additional exhibits, comprising over 1,800 pages.  *See* ECF Nos. 56, 57, 58, 59 (and corresponding sub-filings).

49.     On May 10, 2019, the parties filed Responses in Opposition to the Motions for Summary Judgment.  ECF Nos. 60, 61.  CNS' opposition to Defendants' summary judgment filing contained 3 declarations and 18 exhibits, comprising nearly 450 pages.  *See* ECF No. 60. Defendants' opposition to CNS' motion for summary judgment contained one declaration, four additional exhibits, and comprised over 70 pages.  *See* ECF No. 61.  On May 24, 2019, the parties filed Replies in support of their Cross Motions for Summary Judgment.  ECF Nos. 67, 68. CNS' reply filing contained 2 declarations, 5 additional exhibits, and comprised nearly 100 pages.  *See* ECF No. 67 (and corresponding sub-filings).  Defendants' reply filing contained one exhibit and comprised 24 pages.

**Trial Preparation for First-Scheduled Trial (June 18, 2019) and First Trial Rescheduling**

50.     In addition to drafting CNS' summary judgment opposition and cross-motion, CNS' counsel was also preparing for trial, including preparing necessary disclosures and preparing witnesses, which was scheduled to begin on June 18, 2019.

51.      On May 15, 2019, the Court amended its scheduling order to reschedule the bench trial from June 18, 2019 to October 29, 2019.  ECF No. 62.

52.      During the Summer and early-Fall of 2019, CNS' counsel began preparing for the October trial, including drafting necessary disclosures (including proposed findings of fact and conclusions of law and the proposed pretrial order with factual contentions and triable issues), and preparing witnesses.

53.      On October 7, 2019, counsel for CNS and counsel for Defendants held an attorneys' conference in the Norfolk, Virginia office of Willcox & Savage, P.C. to discuss the necessary pretrial disclosures and pretrial order.

**Trial Preparation for Second-Scheduled Trial (October 28, 2019) and Second Rescheduling**

54.      On October 23, 2019, after extensive preparation for the October 29, 2019 trial date had occurred, the Final Pretrial Conference was rescheduled for January 16, 2020, and the bench trial was rescheduled for January 28, 2020.

55.      During late-2019 and January 2020, CNS' counsel again continued preparing for the January 2020 trial, including revising and drafting necessary disclosures (including proposed findings of facts and conclusions of law and the proposed pretrial order with factual contentions and triable issues), and preparing witnesses.  As part of CNS' trial preparation, BCLP conducted trial preparation sessions with William Girdner (CNS' Editor and Founder), Ryan Abbott (CNS' Southeast Bureau Chief), Amita Kancherla (CNS' expert witness), Jocelyn Rardin, Joan Hennessey, and Brandi Buchman (CNS' reporters covering Defendants' courts who were also included on Defendants' witness list).  Given the nature of the trial and testimony elicited from other witnesses, CNS decided not to call any of the CNS reporters and they were also not called by Defendants.

56.     On January 16, 2020, at the Final Pretrial Conference, the Court heard argument on the parties' cross-motions for summary judgment and denied both motions.  ECF No. 76.  The Court stated that CNS has "a legitimate complaint under the First Amendment to have these civil complaints made available," that "a fair resolution of this case would be for the Court to declare that [CNS] ha[s] a First Amendment right to contemporaneous access to all civil cases," and that "I would define contemporaneous meaning on the date that they're filed insofar as that's practicable."  Transcript of Proceedings, January 16, 2020, ECF No. 75, at 30:4-6, 37:21-25.  The Court then afforded the parties an opportunity "to confer with each other and tell me if you can agree on some kind of language that declares -- I mean, the Court's persuaded that you have the First Amendment right and that you're entitled to some form of relief."  *Id.* at 38:18-22.  The Court stated that "[i]t would be wise" if trial could be "avoided" and the parties could "resolve everything but attorneys' fees."  *Id.* at 49:19-21.

57.     While CNS believed that an injunction was justified, it was amenable to the Court's declaratory judgment language and proposed disposition of the case.  Following the court hearing, Defendants informed CNS that it would not accept the Court's declaratory judgment language, and no agreement was reached by and among the parties.

58.     Because of an ongoing criminal trial, this trial did not commence as scheduled on Tuesday, January 28, 2020, and BCLP counsel and support staff (as well as local counsel), CNS' witnesses, and its expert were housed in Norfolk, Virginia for the week of January 27, 2020 preparing for and in anticipation of the start of trial.

**Bench Trial Held January 31, 2020 – February 5, 2020**

59.     The trial started on Friday, January 31, 2020, and lasted through Wednesday, February 5, 2020.

60.     The Court announced its decision from the bench following closing arguments on February 5, 2020.  The Court concluded that approximately 35-40% of civil filings in the Norfolk Circuit Court were made available on the same day – thus, 60-65% were withheld for one day or longer – and approximately 60% of new civil filings in the Prince William Circuit Court were made available on the same day.  *See* Trial Tr. Vol. 4, at 588:22-589-1, 589:23-25. The Court also noted that Defendants' position was "setting up a straw man and then knocking him down" and called Defendants' oft-repeated arguments about rescanning (and Defendants' expert's exclusive reliance on), "a red herring."  *Id.* at 581:13-14, 592:1.

61.     The Court provided CNS with a declaratory judgment virtually identical to that suggested at the Final Pretrial Conference:  "The First Amendment requires that [newly-filed court documents] be made available contemporaneously with their filing.  Contemporaneously means the same day unless that's not practicable [and] the Court believes that approximately 85 to 90 percent of the new civil filings should be made available on the same day as filed."  Trial Tr. Vol. 4, at 587:20-23, 590:24-591:1.

62.     On February 20, 2020, the Court issued its written Opinion and Order.

63.     CNS brought this suit to enforce a fundamental First Amendment right of the press and public, and the declaratory relief afforded CNS represents a decisive victory not only for CNS, but for other media and the public at large.  Indeed, the Court's decision has received extensive publicity in the media, further demonstrating the importance of the decision.  *See Judge Says State Courts Must Offer Timely Access to New Filings*, Associated Press (Feb. 23, 2020), https://apnews.com/163fad0b6f4f9c72b54c75fb2948922c (republished by The Washington Post, WTKR3, The Miami Herald, and U.S. News and World Report).

## DISCOVERY & THIRD-PARTY DISCOVERY

64.     The parties undertook robust discovery in this case, including interrogatories, requests for the production of documents ("RFPD"), requests for admission, and depositions in this case.

65.     CNS was required to conduct extensive fact discovery in order to establish, among other things, that Defendants had a policy, practice, or custom of delaying access to newly-filed civil complaints, and that due to this policy, practice, or custom, CNS had been denied access.  Defendants repeatedly denied not only the existence of such policy, practice, or custom, but also the existence of *any* delays in the processing of newly-filed civil complaints, instead relying on conclusory statements that there was "compelling evidence" disproving CNS' delay allegations.  *See* Opinion at 13, ¶ 52 (citing Defendants' Answer, ECF No. 52); *see generally infra*.  Defendants also flatly denied the existence of data establishing processing times for newly-filed civil complaints.

66.     Accordingly, CNS was forced to conduct not only extensive fact discovery, but also to retain an expert witness once it was finally able to obtain electronic data maintained by OES that established processing times for newly-filed civil complaints.

67.     Over several months of discovery, Defendants offered numerous justifications for why it was not possible to provide such data: sometimes it was that no such data existed (*see, e.g.,* Schaefer's Response to CNS' First Set of Requests for Production of Documents Nos. 10-21; Smith's Response to CNS' First Set of Requests for Production of Documents No. 9-20); at other times, it was because the data was not within Defendants' possession, custody, or control (*see, e.g.,* Schaefer's Objections to CNS' First Set of Requests for Production of Documents Nos. 10-21; Smith's Objections to CNS' First Set of Requests for Production of Documents No.

9-20); and eventually asserting that the OES Data produced pursuant to a subpoena by OES was "unreliable and should not be used."  Defendants' Proposed Findings of Facts and Conclusions of Law, ECF No. 85, at 19 n.2.

68.    CNS was entitled to receive the scan date data when it was first requested from Defendants, regardless of what Defendants or anyone else claims that it represents.   The sequence of events and CNS' significant undertakings to obtain this critical information – placed in issue by Defendants' positions and arguments – is outlined in detail below.

69.    Defendants also propounded extensive written discovery on CNS – serving a total of five sets of interrogatories (Schaefer 3, Smith 2); four sets of requests for the production of documents (Schaefer 2, Smith 2); two requests for admission (Schaefer 1, Smith 1).  In addition, Defendants took four depositions – 3 fact depositions and a 30(b)(6) deposition.

**CNS' Written Discovery Requests, Document Requests & Defendants' Productions**

70.    Given Defendants' repeated denials that there were any delays at all during the period at issue in the Complaint, CNS propounded written discovery as follows:  On September 12, 2018, CNS served on Defendant Schaefer its First Set of Interrogatories and First Set of Requests for Production of Documents.  On September 27, 2018, Defendant Schaefer served objections to these discovery requests.  On October 19, 2018, Defendant Schaefer served his answers to interrogatories and responses to the requests for production, as well as 186 pages of documents.

71.    On September 12, 2018, CNS served on Defendant Smith its First Set of Interrogatories and First Set of Requests for Production of Documents.  On September 27, 2018, Defendant Smith served objections to these discovery requests.  On October 19, 2018, Defendant

Smith served her answers to interrogatories and responses to the requests for production, as well as 181 pages of documents.

72.     On October 23, 2018, Defendants' counsel produced to CNS' counsel 1,980 pages of additional documents.

73.     Defendants consistently responded "none" when asked for documents with information about various processing dates and times for newly-filed civil complaints:  In CNS' First Set of Requests for Production of Documents to both Defendants, CNS requested "[d]ocuments reflecting or sufficient to establish the number of new paper complaints filed with the [Norfolk/Prince William] Circuit Court from January 1, 2018 to the present."  Schaefer RFPD No. 10; Smith RFPD No. 9.  The Response from both Defendants was "None."  The same request was made for e-filed complaints and Defendants again responded with "None."  *See* Schaefer RFPD No. 11; Smith RFPD No. 10.

74.     In CNS' First Set of Requests for Production of Documents to both Defendants, CNS requested "[d]ocuments reflecting the date and time each new paper civil complaint was initially received for filing by the [Norfolk/Prince William] Circuit Court."  Schaefer RFPD No. 12; Smith RFPD No. 11.  The Response from both Defendants was "None."  The same request was made for e-filed complaints and Defendants again responded with "None."  *See* Schaefer RFPD No. 13; Smith RFPD No. 12.

75.     In CNS' First Set of Requests for Production of Documents to both Defendants, CNS requested "[d]ocuments reflecting the date and time each new paper civil complaint was first accessible for viewing by the public and/or the media at the public access terminals located within the [Norfolk/Prince William] Circuit Court Clerk's Office."  Schaefer RFPD No. 14; Smith RFPD No. 13.  The Response from both Defendants was "None."  The same request was

made for e-filed complaints and Defendants again responded with "None." *See* Schaefer RFPD No. 15; Smith RFPD No. 14.

76.　　In CNS' First Set of Requests for Production of Documents to both Defendants, CNS requested "[d]ocuments reflecting the date and time each new paper civil complaint was scanned into digital form." Schaefer RFPD No. 16; Smith RFPD No. 15.　The Response from both Defendants was "None."　The same request was made for when e-filed complaints were "accepted" and Defendants again responded with "None." *See* Schaefer RFPD No. 17; Smith RFPD No. 16.

77.　　In CNS' First Set of Requests for Production of Documents to both Defendants, CNS requested "[d]ocuments reflecting the date and time when the filing fee for each new paper civil complaint was Processed, including but not limited to payment receipts issued to filers or other records reflecting the dates and times when payment receipts were issued and any Documents reflecting the date and time of payment clearance or approval." Schaefer RFPD No. 18; Smith RFPD No. 17.　The Response from both Defendants was "None."　The same request was made for e-filed complaints and Defendants again responded with "None." *See* Schaefer RFPD No. 19; Smith RFPD No. 18.

78.　　In CNS' First Set of Requests for Production of Documents to both Defendants, CNS requested "[d]ocuments reflecting the amount of time that elapsed from when each new paper civil complaint was received at the [Norfolk/Prince William] Circuit Court for filing to the moment it became accessible for viewing on the public access computer terminals." Schaefer RFPD No. 20; Smith RFPD No. 19.　Defendants both objected on the basis of "attorney-client privilege and work product doctrine" and then responded with "None."　The same request was

made for e-filed complaints and Defendants again responded with "None."  *See* Schaefer RFPD
No. 21; Smith RFPD No. 20.

79.     These responses are in contradiction to both Defendants' Answers to
Interrogatories Nos. 5 and 12, which recognized the existence of "statistical data" and stated that
any compilation of such data "would need to be extracted manually through an individual case-
by-case review in CCMS and recording the statistical information by hand."  As third-party
discovery ultimately yielded, however, OES could generate such reports and no such manual
extraction was required.

80.     On October 25, 2018, CNS' counsel sent Defendants' counsel a deficiency letter
regarding these (and other) discovery responses and the document production.  On October 30,
2018, Defendants' counsel sent CNS' counsel a response letter noting that "Defendants have
requested information responsive to Document Request Nos. 10-21 (Schaefer) and Document
Request Nos. 9-20 (Smith) from OES.  OES is in the process of addressing these requests."

81.     On November 9, 2018 and November 14, 2018, Defendants produced to CNS a
combined 902 pages of documents and a native Microsoft Excel Spreadsheet.  However,
whatever the source of these additional documents, they did not address concerns raised by CNS'
October 25, 2018 letter – namely, to be provided data establishing when newly-filed civil
complaints were filed and when they were scanned or made available to the public.  CNS' efforts
to obtain this responsive information is detailed in "Third-Party Discovery" below.

82.     On January 4, 2019, CNS served on Defendant Schaefer its Second Set of
Requests for Production of Documents.  On January 22, 2019, Defendant Schaefer served
objections to this discovery request.  On February 4, 2019, Defendant Schaefer served responses
to this discovery request.

22

83.     On February 12, 2019, CNS served on Defendant Smith its Second Set of Requests for Production of Documents.   On February 27, 2019, Defendant Smith served objections and responses.

84.     On March 8, 2019, CNS served on Defendant Schaefer its Second Set of Interrogatories, Third Set of Requests for Production of Documents, and First Set of Requests for Admission.  On April 1, 2019, Defendant Schaefer served objections to these discovery requests. On April 10, 2019, Defendant Schaefer served responses to these discovery requests; he then served Supplemental Responses to CNS' Second Set of Interrogatories on April 23, 2019.

85.     On March 8, 2019 CNS served on Defendant Smith its Second Set of Interrogatories, Third Set of Requests for Production of Documents, and First Set of Requests for Admission. On April 1, 2019, Defendant Smith served objections to these discovery requests. On April 10, 2019, Defendant Smith served responses to these discovery requests; she then served Supplemental Responses to CNS' Second Set of Interrogatories on April 23, 2019.

86.     Defendant Schaefer produced over 6,200 pages of documents in response to CNS' document requests and Defendant Smith produced over 3,200 pages of documents in response to CNS' document requests.  However, Defendants' voluminous document productions lacked the "compelling evidence" Defendants repeatedly claimed established the absence of any delays in making newly-filed complaints publicly available.  As a result, CNS was required to conduct third-party discovery to obtain the OES Data.

**Defendants' Refusal to Produce Responsive Records Forced CNS to Conduct Third-Party Discovery of OES**

87.     On or about November 19, 2018, without having received responsive material from Defendants (as propounded in discovery), CNS served a subpoena and subpoena duces tecum upon counsel for OES.  ECF No. 57-1, at 203-214.

88.     The subpoena duces tecum requested, *inter alia*, documents for the Norfolk and Prince William Circuit Courts that:

> [I]ndicate for each new civil complaint: the date and time a civil complaint is first submitted for filing; the date and time a civil complaint is first received for filing; the date and time of credit card pre-authorization for each complaint (if applicable); the date and time when the filing fee for each new civil complaint was processed[;] the date and time reflecting when filing fee payments were approved or processed; the date and time each civil complaint is scanned into digital form (if applicable) through CCMS, CIS, or FMS; the date and time each new civil complaint is first inputted into CCMS, CIS, or FMS; the date and time of acceptance by the respective circuit court clerk's office of each newly-filed complaint; the date and time of the "cashier code" entry by the respective circuit court clerk's offices (if applicable); and the date and time each civil complaint was made available for viewing on the public access terminals.

*Id.* at 213

89.     The subpoena duces tecum also requested documents for the Norfolk and Prince William Circuit Courts "reflecting or sufficient to establish the number of new complaints filed [during the relevant period]" and "[d]ocuments reflecting the amount of time that elapsed from when each new civil complaint was received [...] for filing [...] to the moment it became accessible for viewing on the public access computer terminals." *Id.* at 213.

90.     On December 14, 2018 and December 18, 2018, counsel for OES produced documents in response to the subpoena duces tecum.

91.     However, the December 14, 2018 and December 18, 2018 document productions did not contain any documents containing data on when new paper civil complaints were scanned into CIS or made available to the public.  Instead, OES produced documents providing data on when the basic case information was made available on the public access computer terminals.

92.     On December 19, 2018, counsel for CNS took the deposition of Robert Smith, the OES designee, pursuant to the OES subpoena.  During his deposition (at which Defendants'

counsel was present), Mr. Smith testified – and CNS learned for the first time in this case – that OES does "track when documents are scanned," and that OES "can give you reports of when -- of when every image was scanned, but we cannot tell you when the first image to a case was scanned."  Deposition Testimony of Robert Smith, read in to record, Transcript of Proceedings, February 4, 2020 ("Trial Tr. Vol. 3"), ECF No. 94, at 413:5-16; 414:25-415:2.

93.     On January 17, 2019, counsel for OES made a supplemental document production of documents responsive to the subpoena duces tecum to include two new columns in the OES Data: "DATETIME_AVAILABLE_IN_CIS"(Column 11) and "DATETIME_DOCUMENTS_ AVAILABLE_TO_PUBLIC" (Column 14).  The OES Data spreadsheet largely comprised what was Joint Trial Exhibit 1a-e.  This was the *first* time in this litigation that Defendants or OES provided any documents with data containing the date that complaints were scanned and made available to the public, notwithstanding CNS' months-long and time-consuming requests and attempts to obtain such data.

94.     The OES Data contradicts Defendants' prior statements that no such records existed and, as the Court ultimately found, contradicts Defendants' repeated and blanket denial that no delays in access to newly-filed civil complaints existed.

**Defendants' Written Discovery Requests, Document Requests & CNS' Production**

95.     On October 12, 2018, Defendants separately served CNS with their First Sets of Interrogatories and First Sets of Requests for Production of Documents.  On October 29, 2018, CNS served objections to these discovery requests.  On November 20, 2018, CNS served its answers to interrogatories and responses to the requests for production of documents.

96.     On February 15, 2019, CNS served on Defendants' counsel its Supplemental Response to Interrogatory No. 10.

97.     On February 19, 2019, counsel for CNS served its privilege log on counsel for Defendants.

98.     On March 14, 2019, Defendant Schaefer served CNS with his Second Set of Interrogatories.  On March 29, 2019, CNS served objections to these interrogatories.  On April 15, 2019, CNS served its answers to the interrogatories.

99.     On March 22, 2019, CNS served on Defendants' counsel its Supplemental Responses to Request Nos. 3, 4, and 24 of Defendant Schaefer's Requests for the Production of Documents and its Supplemental Responses to Request Nos. 3, 4, and 24 of Defendant Smith's Requests for the Production of Documents.

100.    On April 4, 2019, counsel for CNS served a supplemental privilege log on counsel for Defendants.

101.    On April 9, 2019, Defendant Schaefer served CNS with his Third Set of Interrogatories, Second Set of Requests for Production of Documents, and First Request for Admission, and Defendant Smith served CNS with her Second Set of Interrogatories, Second Set of Requests for Production of Documents, and First Request for Admission.   On April 24, 2019, counsel for CNS served on counsel for Defendants its objections to Schaefer's Third Set of Interrogatories, Second Set of Requests for Production of Documents, and First Request for Admission, and its objections to Smith's Second Set of Interrogatories, Second Set of Requests for Production of Documents, and First Request for Admission.  On May 9, 2019, counsel for CNS served on counsel for Defendants its objections and responses to Schaefer's Third Set of Interrogatories, Second Set of Requests for Production of Documents, and First Request for Admission, and its objections and responses to Smith's Second Set of Interrogatories, Second Set of Requests for Production of Documents, and First Request for Admission.

102.    On April 30, 2019, CNS served on Defendants' counsel its Supplemental Response to Schaefer Interrogatory No. 19 and its Supplemental Response to Smith Interrogatory No. 16.

103.    On May 9, 2019, CNS served on Defendants' counsel its Second Supplemental Responses to Request Nos. 3 and 24 of Defendant Schaefer's Requests for the Production of Documents and its Second Supplemental Responses to Request Nos. 3 and 24 of Defendant Smith's Requests for the Production of Documents.

104.    On May 9, 2019, counsel for CNS served a second supplemental privilege log on counsel for Defendants.

105.    CNS produced to Defendants documents on or about November 20, 2018, November 21, 2018, November 27, 2018, December 6 2018, January 15, 2019, February 15, 2019, March 19, 2019, April 23, 2019, May 6, 2019, and May 9, 2019.

106.    In all, CNS produced over of 8,650 pages of documents in response to Defendants' document requests.

**<u>Depositions</u>**

107.    During the period from September 2018 through March 2019, both parties also took numerous depositions.  CNS took the depositions of Defendant Schaefer on November 28, 2018; Tom Larson (Norfolk Chief Deputy Clerk) on November 29, 2018; Brenda Elford (Prince William Civil Division Supervisor) on January 7, 2019; Defendant Smith on January 8, 2019; Jillian Richards (Prince William Deputy Clerk Manager) on January 9, 2019; Crystal Porter (Norfolk Civil Division Supervisor) on February 6, 2019; a 30(b)(6) designee on behalf of the Prince William Circuit Court on March 21, 2019; and a 30(b)(6) designee on behalf of the

Norfolk Circuit Court on March 28, 2019.  The necessity of each of these depositions is amply demonstrated by the record in this case and as adduced at trial.

108.     CNS defended the following depositions taken by Defendants' counsel: Jocelyn Rardin (CNS' Norfolk Reporter) on February 4, 2019; Joan Hennessey (CNS' Prince William Reporter) on February 4, 2019; Ryan Abbott (Southeast Regional Bureau Chief) on February 5, 2019; and a 30(b)(6) designee on behalf of CNS on April 8, 2019.

### CNS' RETENTION OF EXPERT WITNESS

109.     Given Defendants' dispute over the factual allegations regarding delays in the processing of newly-filed civil complaints in the Norfolk and Prince William Circuit Court's Clerks' offices, CNS retained an expert witness to analyze and calculate the delays in both offices based on the OES Data.

110.     In or around December 2018, CNS retained the services of Amita Kancherla, a Director at Alvarez & Marsal Disputes and Investigation, LLC's Washington, D.C. office.

111.     Ms. Kancherla was retained to analyze the OES Data for the relevant period addressed in CNS' Complaint and calculate the number of court days it took for Defendants to make newly-filed civil complaints available to the public in both the Norfolk and Prince William Circuit Court Clerks' offices.

112.     Ms. Kancherla prepared two expert reports: a March 19, 2019 Report, ECF No. 58-3, at 10-50, and a May 6, 2019 Rebuttal Report, ECF No. 60-3, at 73-136.

113.     Ms. Kancherla's March 19, 2019 Report found that from January through June 2018 and based on the OES Data, 5% of complaints were made available to the public on the same day they were filed in the Norfolk Circuit Court and that, during the same period, 38% of

complaints were made available to the public on the same day they were filed in the Prince William Circuit Court.

114.    The allegations of delays that comprised CNS' Complaint were based on CNS' own tracking data compiled by CNS' reporters ("CNS Tracking Data") who covered the Norfolk and Prince William Circuit Courts on a daily basis.  The CNS reporters recorded when cases were filed based on the date stamp that appeared on the complaints and the dates that these complaints were first made available for public viewing.  The Complaint alleged that only 16% of newly-filed civil complaints were made available the same day in the Norfolk Circuit Court and only 27% of newly-filed civil complaints were made available the same day in the Prince William Circuit Court.  ECF No. 1, ¶ 3.  Delay calculations in the Complaint were made in *calendar* and not court days.  For her analysis, Ms. Kancherla calculated delays in court days and made additional modifications to the OES Data, as explained below.

115.    As part of her expert analysis, Ms. Kancherla reviewed the OES Data, compared such data with the CNS Tracking Data, interviewed the three CNS reporters assigned to the respective courts during the relevant period, traveled to the Norfolk and Prince William Circuit Court Clerk's offices on multiple occasions to perform an independent verification of the date of filing by examining the physical file stamps on the complaints, and corrected the OES file date where appropriate.  She also reviewed all deposition transcripts, reviewed Defendants' document production of court closures, reviewed the CNS reporters' timesheets, and spoke with counsel. ECF No. 58-3, at 18-20.

116.    Ms. Kancherla's May 6, 2019 Rebuttal Report responded to the April 19, 2019 reports of Defendants' expert, Dr. David W. Harless, in which he used an entirely different metric in presenting his delays and different end points for calculating such delays, and attacked

Ms. Kancherla's reliance on the OES scan date as the date filings become available because of the possibility of rescanning.  Ms. Kancherla's rebuttal report addresses the many inconsistencies and issues with Defendants' expert reports.  Ms. Kancherla's Rebuttal Report also calculates the length of delays (using the same methodology as her March 19, 2019 Report) for the period from July 1, 2018 to December 4, 2018.  *See generally* ECF No. 60-3, at 73-136.  Her Rebuttal Report also contains a supplemental analysis finding that after the filing of this lawsuit, same-day access to newly-filed civil complaints improved in both courts, reaching approximately 90% in the Norfolk Circuit Court Clerk's Office and 78% in the Prince William Circuit Court Clerk's Office.  ECF No. 60-3, at 120-121.

117.    BCLP relied on Ms. Kancherla for her analysis and understanding of the calculations in their summary judgment briefing as well as at trial, and BCLP attorneys conducted numerous trial preparation sessions with Ms. Kancherla.

118.    Ms. Kancherla's expert reports formed the basis for her February 3, 2020 trial testimony regarding her analysis of the OES Data and her use of the CNS Tracking Data to corroborate the OES Data, and her testimony was provided for the Court to use and rely upon in reaching its conclusion regarding the delays at issue.

119.    The Court found that "Ms. Kancherla's opinions are entitled to significant weight and are reasonably consistent with the OES statistics."  Opinion at 17, ¶ 62.  The Court accorded Dr. Harless' testimony "little weight" because he "relied on an incorrect data set for this case."  *Id.* at 13, ¶ 55.

120.    CNS incurred $194,333.58 in costs associated with retaining Alvarez & Marsal and for the work relating to Ms. Kancherla's expert report, rebuttal report, trial preparation, trial

testimony, and related matters.  A detailed accounting of Alvarez & Marsal's time and expenses is attached hereto as **Exhibit D**.

## FEE REQUEST & REDUCTION OF TIMEKEEPERS AND HOURS BILLED

121.    CNS has incurred and is claiming a total amount of $2,258,505.83 in fees and costs from April 1, 2018 through February 28, 2020.  Of that amount, $2,025,946.00 is for attorneys' fees and $232,559.83 is for costs.   More specifically, CNS is claiming: (1) $1,890,198.50 in fees incurred prior to the conclusion of trial on February 5, 2020;[1] (2) $135,747.50 in fees incurred after the conclusion of trial on the present fee motion and accompanying declarations;[2] and (3) $232,559.83 in non-taxable costs.[3]

**Request for Fees Incurred Between April 1, 2018 through February 5, 2020**

122.    The CNS team at BCLP is comprised of many lawyers in various offices, led by CNS' outside general counsel and BCLP partner Rachel Matteo-Boehm in BCLP's San Francisco, California office, whose declaration attesting to CNS' payment of BCLP's invoices in this action is filed contemporaneously herewith.

123.    A number of lawyers, paralegals, e-discovery database managers, and other professionals performed work on CNS' behalf in connection with this matter, which started in 2017.

---

[1]  For the April 1, 2018 through February 5, 2020 time period, $1,750,021.50 was billed by BCLP and $140,177.00 was billed by Willcox & Savage.  *See* Ex. E; *see also* Declaration of Conrad M. Shumadine, Ex. 1.

[2]  This includes work performed between February 6, 2020 and February 28, 2020 by BCLP (amounting to $72,821.50) and Willcox & Savage ($8,842.00), and work performed through February 29, 2020 by Hunton Andrews Kurth ($54,084.00).  *See* Ex. F; *see also* Declaration of Conrad M. Shumadine, Ex. 1; Declaration of Robert M. Tata, Ex. A.

[3]  Of this amount, $194,333.58 is related to work performed by Ms. Kancherla and Alvarez & Marsal, and $38,226.25 is related to travel and other expenses reasonably incurred in connection with the litigation.  *See* Exs. D and G.

124.    However, for purposes of this attorneys' fee application, CNS is only seeking attorneys' fees for time billed by the three BCLP lawyers present for trial: myself, Heather Goldman, and Bryan Harrison, as well as for paralegal Eileen M. Weiss, and local counsel, Conrad M. Shumadine, paralegal Patricia Yoder, and litigation support analyst Nilsa Martinez.

125.    While CNS' trial team consisted of myself, Ms. Goldman, and Mr. Harrison, we divided the case effort among the three of us.  For the most part, Ms. Goldman focused on the Norfolk Circuit Court – taking the depositions of the Norfolk witnesses and being prepared to examine those witnesses (both CNS' and Defendants') at trial – and Mr.  Harrison focused on the Prince William Circuit Court – taking the depositions of the Prince William witnesses and being prepared to examine those witnesses (both CNS' and Defendants') at trial.  When necessary, however, Ms. Goldman and Mr. Harrison performed tasks related to both Defendants.  For example, Ms. Goldman defended the deposition of the CNS reporter covering Prince William and Mr. Harrison defended the deposition of the CNS reporter covering Norfolk.  In addition, Mr. Harrison prepared and defended CNS' Southeast Bureau Chief Ryan Abbott at his fact deposition, took the lead on discovery from OES, including taking the deposition of its designee, and cross-examined Crystal Porter, the Supervising Deputy in the Civil Division in Norfolk, at trial.  Ms. Goldman prepared and defended Mr. Abbott for his 30(b)(6) deposition testimony, and also prepared Mr. Abbott for his trial testimony.  She also prepared for the expected directed verdict motion made by Defendants, which the Court denied without hearing argument from CNS, and presented CNS' closing argument.  I conducted the Rule 30(b)(6) depositions of both parties, took the lead in preparing William Girdner (CNS' Editor and Founder) and Amita Kancherla (CNS' expert witness) for trial testimony, presented CNS' Opening Argument, and conducted the cross-examination of Defendants' expert witness.

126.    CNS is only seeking attorneys' fees for time billed by these timekeepers *after* April 1, 2018.[4]

127.    CNS has also removed substantial time entries associated with CNS' Motion for Preliminary Injunction, which it withdrew after Defendants made factual contentions denying the existence of any delays and vowing to provide "compelling evidence" that no such delays existed.

128.    Further, CNS has removed most time entries where there were two or more timekeepers concurrently performing similar tasks, or where two or more timekeepers were billing for the same event, *i.e.*, there is only one timekeeper billed for depositions, even where there may have been two attorneys present, though two attorneys are billed if they attended court conferences, conferences with Defendants' counsel, etc.  Also, given the complexity of the issues, two attorneys are billed for attendance at the deposition of the OES designee.

129.    There were several BCLP attorneys (not myself, Ms. Goldman, or Mr. Harrison) who were primarily responsible for the substantial electronic discovery, document production, and document review undertaken in this case.  CNS has removed all of these attorneys' time entries, and, as a result, is not seeking attorneys' fees for the vast majority of time BCLP spent on electronic discovery, document production, and document review.

130.    CNS has also removed time entries associated with tasks relating to ancillary issues that did not form the basis of the claims or defenses in this action.  For example, during Defendant Smith's deposition, she offered CNS access to the Prince William Circuit Court's Officers of the Court Remote Access System ("OCRA").  Counsel for CNS undertook tasks relating to Defendant Smith's offer and, accordingly, CNS has removed any time billed relating

---

[4]  CNS incurred attorneys' fees prior to April 1, 2018 in connection with the *Schaefer* Matter, but CNS is not seeking any of those fees as part of this application for attorneys' fees.

to that inquiry (which offer has not come to fruition) and other ancillary issues.  In addition, CNS has removed any time billed relating to the revision of summary judgment briefs due to an error in spacing.

131.    CNS is also not seeking recovery of fees incurred between February 6, 2020 and February 28, 2020 (the "Post-Trial Period") that are related to general aspects of the case and the trial (*i.e.,* reviewing transcripts from the trial proceedings, reviewing the Court's Opinion and Order, etc.).   As discussed below, however, CNS is seeking recovery of some of the fees incurred during this Post-Trial Period related to the preparation of this Fee Application.[5]

132.    CNS has also removed significant amounts of billed time relating to all aspects of the litigation – written discovery requests, written discovery responses, document review, document production, deposition preparation materials, legal research, and assistance with drafting and editing briefs in connection with Defendants' motions to dismiss and the parties' cross-motions for summary judgment – as some work related to these tasks were handled by attorneys and fee earners outside of the core CNS trial team.  CNS has also reduced hours billed for specific tasks on the remaining entries where appropriate.

133.    As explained above, the hourly rate charged to CNS for this case during all periods was kept the same.  This hourly rate was based off the 2018 rates plus an approximate 10% discount.

134.    CNS' counsel's review and removal of these types of entries reduces the total amount of fees CNS seeks vis-a-vis the total amount of fees billed to and paid by CNS by a substantial amount.  Indeed, CNS has voluntarily excluded more than one-third of the time billed

---

[5]  In order to complete the Fee Application in time for filing, CNS is only seeking fees related to the preparation of the Fee Application through February 28, 2020 for BCLP and Willcox & Savage, and through February 29, 2020 for Hunton Andrews Kurth LLP.

and paid from the lodestar calculation.  *See generally* Declaration of Rachel Matteo-Boehm, filed contemporaneously herewith, and incorporated by reference.

135.    CNS' application for fees is supported by the detailed billing entries attached hereto as **Exhibit E**.  The billing entries comprising Exhibit E are taken from my review of BCLP's invoices sent to CNS and are the product of contemporaneous time entries made from the respective timekeeper on a regular basis and in the normal course of business.

136.    CNS' application for fees also seeks the attorneys' fees for its local counsel, Conrad Shumadine, whose detailed billing entries are attached to the Declaration of Conrad M. Shumadine, filed contemporaneously herewith, and incorporated by reference.

137.    In sum, CNS' attorneys' fee request seeks (by timekeeper) through the end of trial (February 5, 2020):

| Table 1 - Attorneys' Fee Request from April 1, 2018 through February 5, 2020 | | | |
|---|---|---|---|
| **Timekeeper** | **Total Hours** | **Rate** | **Total** |
| William Hibsher | 868.50 | $730 | $ 634,005.00 |
| Heather Goldman | 1,140.10 | $590 | $ 672,659.00 |
| Bryan Harrison | 714.90 | $545 | $ 389,620.50 |
| Eileen Weiss | 185.30 | $290 | $ 53,737.00 |
| Conrad Shumadine | 243.3 | $450 | $109,485.00 |
| Patricia Yoder | 3.6<br>36.2<br>59.2 | $155 (2018)<br>$155 (2019)<br>$160 (2020) | $558.00<br>$5,611.00<br>$9,472.00 |
| Nilsa Martinez | 21.3<br>49.2 | $210 (2019)<br>$215 (2020) | $4,473.00<br>$10,578.00 |
| **TOTAL** | **3,321.6** | | **$1,890,198.50** |

**Request for Fees Incurred Between February 6, 2020 and February 28, 2020  in Connection with Preparing Attorneys' Fees Application**

138.     In support of this fee application, CNS has retained Robert M. Tata, the Norfolk Office Managing Partner for Hunton Andrews Kurth LLP to provide a declaration as to the reasonableness and necessity of fees incurred by CNS.  In preparing his declaration, Mr. Tata received assistance from David Parker, an associate at Hunton Andrews Kurth LLP.  Mr. Tata's declaration is filed contemporaneously herewith.

139.     CNS' application for fees also requests those fees incurred as part of preparing this application.  This request for fees on fees excludes all time spent reviewing billing entries and reducing the total fee amount included in the Application.  The detailed billing entries for those fees incurred for work done by BCLP during the Post-Trial Period are attached hereto as **Exhibit F**.  These billing entries have not yet been billed to CNS, but will be billed and collected in the usual course of business.  Detailed billing entries for fees incurred by Willcox & Savage, P.C. during the Post-Trial Period are attached to the Declaration of Conrad M. Shumadine, filed contemporaneously herewith, and incorporated by reference.  Detailed billing entries for fees incurred by Hunton Andrews Kurth LLP during the Post-Trial Period are attached to the Declaration of Robert M. Tata, filed contemporaneously herewith, and incorporated by reference.

140.     In sum, CNS' attorneys' fee request seeks (by timekeeper) the following amounts in connection with the preparation of this application for fees:

| Table 2 - Attorneys' Fee Request for Preparation of Fee Application | | | |
|---|---|---|---|
| **Timekeeper** | **Total Hours** | **Rate** | **Total** |
| William Hibsher | 14.8 | $730 | $10,804.00 |
| Heather Goldman | 63.9 | $590 | $37,701.00 |
| Bryan Harrison | 37.7 | $545 | $20,546.50 |
| Eileen Weiss | 13.0 | $290 | $3,770.00 |
| Conrad Shumadine | 19.4 | $450 | $8,730.00 |
| Patricia Yoder | 0.7 | $160 | $112.00 |
| Robert M. Tata | 51.1 | $845 | $43,179.50 |
| David Parker | 19.3 | $565 | $10,904.50 |
| **TOTAL** | **219.9** | | **$135,747.50** |

## Request for an Award of Non-Taxable Expenses (Costs)

141.   CNS also seeks an award of its non-taxable expenses (costs) in the amount of $232,559.83.  These expenses included charges for Ms. Kancherla's fees and costs as CNS' expert, as contemplated under 42 U.S.C. § 1988(c), travel, and other expenses reasonably incurred in connection with the litigation.  All of these expenses were billed to and paid by CNS, and are not included in CNS' application for taxable costs, which is being filed separately and contemporaneously herewith.  Attached hereto as **Exhibit G** is a detailed list of the claimed non-taxable expenses (generated by BCLP's accounting department), together with supporting invoices and/or other documentation.

142.   Table 3 is a summary of all of the fees and costs sought by CNS in this application for attorneys' fees:

| Table 3 - Total Attorneys' Fee & Costs Request | | | |
|---|---|---|---|
| **Timekeeper** | **Total Hours** | **Rate** | **Total** |
| William Hibsher | 883.3 | $730 | $644,809.00 |
| Heather Goldman | 1,204 | $590 | $710,360.00 |
| Bryan Harrison | 752.6 | $545 | $410,167.00 |
| Eileen Weiss | 198.3 | $290 | $57,507.00 |
| Conrad Shumadine | 262.7 | $450 | $118,215.00 |
| Patricia Yoder | 3.6<br>36.2<br>59.9 | $155 (2018)<br>$155 (2019)<br>$160 (2020) | $558.00<br>$5,611.00<br>$9,584.00 |
| Nilsa Martinez | 21.3<br>49.2 | $210 (2019)<br>$215 (202) | $4,473.00<br>$10,578.00 |
| Robert M. Tata | 51.1 | $845 | $43,179.50 |
| David Parker | 19.3 | $565 | $10,904.50 |
| Costs under 42 U.S.C. § 1988 | ███████████ | ███████████ | $232,559.83 |
| **TOTAL** | **3,541.50** | ███████████ | **$2,258,505.83** |

*** 

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed at New York, New York this 4th day of March 2020.

William J. Hibsher

William J. Hibsher

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of March, 2020, I electronically filed the foregoing with the Clerk of Court using CM/ECF system, which will send a notification of such filing to all counsel of record as listed below:

William W. Tunner (VSB No. 38358)
William D. Prince IV (VSB No. 77209)
Michael G. Matheson (VSB No. 82391)
*Thompson*McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
Tel: (804) 649-7545
Fax: (804) 780-1813
wtunner@t-mlaw.com
wprince@t-mlaw.com
mmatheson@t-mlaw.com

*Counsel for Defendants*

/s/
Conrad M. Shumadine
VSB No. 4325
*Counsel for Plaintiff*
**WILLCOX & SAVAGE, P.C.**
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com

William Hibsher (*Admitted Pro Hac Vice*)
*Counsel for Plaintiff*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Fax: (212) 541-4630
wjhibsher@bclplaw.com

Heather S. Goldman (*Admitted Pro Hac Vice*)
Bryan J. Harrison (*Admitted Pro Hac Vice*)
*Counsel for Plaintiff*
**BRYAN CAVE LEIGHTON PAISNER LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
heather.goldman@bclplaw.com
bryan.harrison@bclplaw.com